## Commonwealth *vs.* Michael P. Caputo.

Suffolk. December 6, 2002. - April 15, 2003.

Present: Marshall, C.J., Greaney, Spina, Cowin, & Cordy, JJ.

*Constitutional Law,* Admissions and confessions, Search and seizure, Assistance of counsel, Self-incrimination, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Relevancy and materiality. *Practice, Criminal,* Voluntariness of statement, Admissions and confessions, Comment by prosecutor, Instructions to jury, New trial, Assistance of counsel, Capital case. *Search and Seizure,* Consent.

At a hearing on a motion to suppress statements made by the defendant to police in the hours after the killings of the defendant's wife and mother-in-law because the statements were procured in violation of his rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, the judge correctly denied the motion where, before the defendant made any statement, the defendant had received and acknowledged that he understood his Miranda rights; where, when the defendant indicated a wish not to speak to the police, all questioning ceased; where the defendant's statements occurred only after and apparently because he had overheard a telephone conversation that tended to implicate him, not because of any interrogation; where the defendant's statements were not the result of coercion or intimidation; and where, with respect to subsequent statements made at a police station, the defendant's claim that those statements were not voluntary was similarly without merit. [156-162]

There was no merit to a criminal defendant's claim, made for the first time on appeal, that statements he made to police at his house in the hours after the killings of his wife and mother-in-law were obtained in violation of his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights because the police transgressed the bounds of his "limited purpose" in allowing them to enter his house, and then remained after his authorization to the police to be in his house ended. [162-163]

At a murder trial, the prosecutor's inquiry about and comment on the defendant's invocation of his right to remain silent did not create a substantial likelihood of a miscarriage of justice, where it could not be concluded that the defendant's exercise of his right to remain silent was in fact used against him; where it was a fair inference that the jury, having heard the defendant place in evidence his assertion of his right to remain silent, understood the reference as part of the defendant's argument that his later incriminating statements were coerced; and where the judge instructed the jury that opening and closing statements were not evidence. [163-167]

At a murder trial, a statement of a lay witness intimating that the defendant
was a danger to his wife should not have been admitted in evidence, even
as limited by the judge, as the statement was not admissible for any relevant
purpose; however, when viewed in the context of the substantial evidence
of the defendant's hostility toward his wife, which necessitated her seeking
and obtaining a protective order against him, the judgment was not
substantially swayed by the error. [167-168]

At a murder trial, the judge acted properly in not informing the jury that they
were required to consider whether the defendant's statements to an
acquaintance prior to the killing of the defendant's wife were voluntary,
where the "humane practice" instruction applied only to admissions or
confessions made after the crime was committed. [168]

At a murder trial, the defendant was not prejudiced by a judge's incorrect
instruction on malice as it applied to the Commonwealth's theory of
deliberate premeditation, where the judge correctly instructed the jury on
the elements of murder by reason of extreme atrocity or cruelty, and the
jury convicted the defendant of murder in the first degree on that theory, as
well as on the theory of deliberate premeditation. [168]

At a criminal trial, the judge was not required to give an instruction to the
jury, immediately after defense counsel impeached a police officer with his
grand jury testimony, that the testimony could be used for substantive
purposes, where the judge was not required to give the instruction before
his final charge to the jury and, in fact, instructed on the issue during his
charge; and where the officer's acknowledgment, during testimony, of the
truth of his prior statement to the grand jury rendered any instruction at
that time largely superfluous. [168-169]

At a hearing on a motion for a new trial in which the defendant claimed that
his trial counsel was ineffective at sentencing by not suggesting to the
judge that the defendant's psychiatric condition should be considered as a
mitigating factor, the judge properly denied the motion, where a more
extensive recitation of the defendant's situation was not likely to have af-
fected the sentences imposed; further, the judge did not err in failing to
authorize defense counsel to retain a psychiatrist to assist the judge in
evaluating the psychiatric records so that counsel could determine whether
there were other substantive issues to pursue on appeal. [169-170]


INDICTMENTS found and returned in the Superior Court Depart-
ment on November 17, 1989.

Pretrial motions to suppress evidence were heard by *Elbert
Tuttle*, J., and the cases were tried before him; motions for an
evidentiary hearing, a new sentencing hearing, and funds to hire
a psychiatrist were heard by *Maria I. Lopez*, J., and a motion
for a new trial, filed on February 15, 1994, was considered by
her.

*John J. Courtney* for the defendant.

*Jane A. Sullivan*, Assistant District Attorney, for the
Commonwealth.

MARSHALL, C.J. In 1991, a Superior Court jury found the defendant, Michael P. Caputo, guilty on two indictments of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. The victims were his estranged wife and his mother-in-law. The trial judge sentenced the defendant to consecutive life sentences.

On appeal,[1] the defendant claims that statements he made to the police in the hours after the killings should have been suppressed because they were procured in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution, and his rights under arts. 12 and 14 of the Massachusetts Declaration of Rights. He also claims that all subsequent statements he made to the police and all items seized pursuant to a warrant should have been suppressed as the "fruits of the poisonous tree." The defendant argues further that (1) the prosecutor impermissibly commented on the defendant's invocation of his right to remain silent; (2) the judge erred in certain evidentiary rulings and jury instructions; and (3) his motion for a new trial claiming ineffective assistance of counsel at sentencing and denying funds for psychiatric assistance should have been allowed. We affirm the convictions and the order denying the defendant's motion for a new trial. We decline to grant relief under G. L. c. 278, § 33E.

1. *Facts.* We summarize the evidence in its light most favorable to the Commonwealth, reserving certain details for discussion in connection with the issues raised.

In the early morning of November 2, 1989, two Boston police officers responded to a radio call dispatching them to a residence on Boylston Street in the Jamaica Plain neighborhood of Boston. They were directed to a second-floor apartment, where the defendant's estranged wife and their two children had been living since some time that year.

In the apartment's bedroom, the police found the body of the

---

[1]This is the defendant's direct appeal. At oral argument, counsel represented that the prolonged period between trial and this appeal was due, in part, to changes in counsel. In addition, in 1997, the defendant successfully petitioned a single justice of this court for funds for an independent psychiatric evaluation to determine whether the defendant was competent to participate in the prosecution of his appeal.

wife, who had been stabbed twenty-two times, and the body of her mother, who had been stabbed seventeen times. At trial, the medical examiner testified that both women died from the stab wounds, both were alive when the wounds were inflicted, and both had suffered defensive wounds.[2] The defendant's two young daughters were also in the apartment, but had not been physically harmed.

The police noted an open kitchen window that led to the back porch, and discovered that the telephone wires to the apartment had been cut. There was no sign of forced entry. On the dining room table, the police found a protective order dated July 31, 1989, ordering the defendant to refrain from abusing his wife and to stay away from the Jamaica Plain apartment. The order contained the defendant's address in Plymouth.

Shortly thereafter, at the request of the Boston police, six Plymouth police officers located the defendant at the Plymouth address. After the defendant gave several statements to the police, in circumstances we describe in some detail below, he was arrested. Later that same afternoon, the police executed a search warrant at the defendant's residence. They recovered a knife set from his home; one knife was missing.[3] The police also found "tin snips" in the defendant's automobile, which were capable of cutting the telephone wires to the victims' apartment.[4]

2. *Motion to suppress.* Prior to trial, the defendant moved to

[2]The medical examiner testified that the wife had knife wounds all over her body, several severed ribs, and perforated organs including her abdomen, liver, lung, and pulmonary artery. He testified that her mother's wounds included several severed ribs, a severed bone in her arm, and a perforated lung, heart, and abdomen.

[3]The Commonwealth's forensic expert testified that the missing knife had a ten-inch blade, two inches at its widest part, and that, to a degree of reasonable scientific certainty, the holes in the bed clothing through which one of the victims was stabbed were consistent with having been made by that size knife.

[4]There was also evidence that a life insurance policy, effective October 25, 1989, in the amount of $100,000 had been purchased in the wife's name for the benefit of the defendant. The application bore the wife's signature, dated July 3, 1989, and was received by Amex Life Assurance Corporation on October 24, 1989. The parties stipulated that the application had been completed by the defendant, and a handwriting expert testified that, in his opinion, the signature and the date were not in the wife's handwriting.

suppress his statements to the police and other evidence.[5] The essence of the defendant's claim is that, when the police first located him, they engaged in overpowering and coercive tactics and, as a result, the presence of the police in his home was not consensual and none of the statements he gave to the police was voluntary. See *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001) ("A statement is voluntary if it is . . . not induced by physical or psychological coercion"). Because our analysis of the defendant's various claims is grounded on the facts as they evolved in the early hours of November 2, 1989, we first describe those facts in some detail.[6]

At approximately 6:25 A.M., after the Plymouth police had been informed by the Boston police that the defendant was a suspect in a double homicide, six officers from the Plymouth police department, including Sergeant Thornton Morse and Sergeant Richard Dorman, arrived at the defendant's house. In an attempt to ascertain whether anyone was home, the police officers knocked repeatedly on the front and rear doors. After the police knocked for five minutes, the defendant opened the front door. Morse and Dorman introduced themselves, inquired as to the defendant's name, and asked whether they could enter the house to speak to him. The defendant responded, "Come on in."

Inside the house, Dorman informed the defendant that the police were investigating a double homicide, and then immediately read the defendant his Miranda rights from a printed card, the first of six occasions during that day that the defendant was advised of his rights. See *Miranda* v. *Arizona*, 384 U.S.

---

[5]The defendant filed five motions to suppress: (1) a motion to suppress his statements made to police; (2) a motion to suppress evidence obtained from a warrantless search of the defendant's home and car; (3) a motion to suppress evidence obtained with a search warrant on November 2, 1989; (4) a motion to suppress his statements made to a civilian witness, Richard Telford; and (5) a motion to suppress all documents used to analyze the defendant's handwriting. The motion judge denied each of the motions, except that he ordered that personal papers and notebooks seized from the defendant's house in the afternoon of November 2, 1989, be suppressed as beyond the scope of the search warrant.

[6]The facts are drawn from the motion judge's findings, which are fully supported by the record, supplemented by uncontested evidence at the suppression hearing.

436 (1966). Dorman asked the defendant whether he understood his rights, to which the defendant initially replied, "No," adding that he was a "little nervous." Dorman then repeated each right, asking after each whether the defendant understood it. The defendant replied affirmatively to each. The defendant then said, "I think it best if I don't say anything at this time." The officers immediately ceased all questions. The defendant did not ask the officers to leave the house.

Morse testified that, after a brief interval, he asked the defendant whether he could use his telephone to call the police station.[7] The defendant agreed. After the telephone call, Morse informed the defendant that the Plymouth police could supply no further information about the crimes, but that someone at the station "was going to get back to me."

Dorman and Morse then went outside, leaving two officers inside the house. The defendant did not ask the remaining two officers to leave. Dorman and Morse examined the automobile in the defendant's driveway, which matched the description given to the Plymouth police. The hood was warm to the touch, and a registration plate other than the defendant's registration number covered the automobile's assigned registration plate.[8]

Dorman and Morse reentered the house, without objection from the defendant. Dorman again asked whether he could use the defendant's telephone to call the Plymouth police station. The defendant again agreed. Dorman informed the lieutenant (within the defendant's hearing) that the defendant was at his residence, that the engine of his automobile was warm, and that there were two different registration plates on his vehicle. The defendant spontaneously stated, "I don't want to incriminate

---

[7]Earlier, when the police had informed the defendant that they were investigating a double homicide on behalf of the Boston police department, the defendant had asked who had died. Dorman replied that he did not know. Morse testified that he asked to use the defendant's telephone, a "land line," rather than use the police scanner because of the sensitive nature of the case, and the likelihood that the public would listen to police broadcasts. Morse testified he wanted to find out more information about the investigation to pass along to the defendant.

[8]It was later determined that the outer registration plate belonged to a Jamaica Plain resident who lived one-quarter to one-half mile away from the crime scene, while the plate assigned to the defendant's automobile was underneath.

myself, but I have something to say about last night." He told the officers that the night before, two men had forced their way into his home, had kidnapped him, and that he had awoken "in a daze" in the Braintree area, wearing only his underwear. The police did not question the defendant.

The defendant agreed to the officers' request to accompany them to the police station. At the station, Morse and a detective once more advised the defendant of his Miranda rights, and provided him with a written copy delineating each right. Morse again read each right to the defendant. The defendant himself read the form, making a check mark after the listing of each right. Asked whether he wished to talk to them, the defendant replied, "I'm not sure, I don't know if I should say anything or not. What should I do?" Morse responded, "I can't tell you that, but I want you to be aware of your rights and that you do not have to say anything to me."

Morse once again informed the defendant of his Miranda rights, ascertained that he understood them, and again asked the defendant whether he wished to speak to the police. Then, and only then, the defendant elaborated on the statement he earlier had given to police in his home. Among other things, the defendant now told the officers that he remembered having blood on him, throwing an object out of his automobile and, at some point during that night, being outside his mother-in-law's home.[9]

At approximately 9:20 A.M. Sergeant Detective Charles Horsley of the Boston police department arrived at the Plymouth police station. Informed that the defendant had received his Miranda rights, he interviewed the defendant for approximately forty-five minutes. When asked whether he had anything to do with the murders, the defendant became upset and stopped talking. The defendant asked to leave the police station, and was informed that he was under arrest.

The motion judge concluded that, although the defendant was not arrested until 1 P.M., his "freedom of action was severely limited from the time that the police arrived at his house," so

---

[9]While at the police station, the defendant was offered cigarettes, coffee, and water. A Plymouth detective testified at the suppression hearing that the defendant appeared to be nervous, but not intimidated.

that he was entitled to Miranda warnings before any police interrogation. The judge further found that, on entering the defendant's house, the officers immediately informed the defendant of his Miranda rights, and ceased all questioning when he indicated he did not want to speak to them. The judge also found that later, at the Plymouth police station, before any questioning, the defendant again received full and complete Miranda warnings, and then knowingly waived his rights before he voluntarily answered police questions.

(a) *Fifth Amendment and art. 12.* The judge was correct to deny the defendant's motion to suppress evidence of his statements while the Plymouth police were in his house. First, before he made any statement, the defendant received and acknowledged that he understood his Miranda rights.[10] Second, when the defendant indicated a wish not to speak to the police, all questioning ceased. See *Commonwealth* v. *Torres*, 424 Mass. 792, 795-796 (1997) ("the admissibility of statements obtained after an invocation of that right depends on whether the person's right to cut off questioning was 'scrupulously honored' "). It was only after he overheard the police conversation that the defendant stated, unprovoked, that he had been kidnapped the previous night. See *Commonwealth* v. *Diaz*, 422 Mass. 269, 271 (1996), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966) ("'Volunteered statements of any kind are not barred by the Fifth Amendment"). We do not agree with the defendant that his statement should be suppressed because the police officer's request to use his telephone was "reasonably likely to elicit an incriminating response" from the defendant, and therefore the "functional equivalent" of an interrogation. *Commonwealth* v. *Torres, supra* at 797-798, quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). The telephone call was a report and

[10]The defendant suggests inferentially that, at some point before he was taken to the police station, he was in "custody." Because the police informed the defendant of his Miranda rights before he made any statements, and because he immediately invoked his right to remain silent, it is not necessary to decide whether the defendant was in custody at this time. As noted earlier, the motion judge found that the defendant was in custody at 1 P.M. when he was arrested, but that, because the defendant's freedom of movement was previously restricted, he was entitled to Miranda warnings before any police interrogation. We see no reason to disagree with that conclusion.

request for further information, an action "normally attendant" to police procedures. See *Rhode Island* v. *Innis, supra.* The defendant's statement occurred only after and apparently because he had overheard the telephone conversation that tended to implicate him, not because of any "interrogation."

The defendant argues that by surrounding his house and knocking continuously until he opened the door, the four officers "coerce[d] their way into the house of the extremely nervous prime suspect of a double homicide intent on questioning him, developing other information, and assuring his availability for Boston police." The evidence is to the contrary, and the motion judge was correct to conclude that the defendant's statement was "not the result of coercion or intimidation." *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001). The defendant gave his consent to the police to enter his home, he did not ask them to leave, and spoke to them only after he recognized that the police had seen potentially incriminating evidence outside. A defendant who is "nervous" because he is in the presence of police within hours of committing murder and who chooses to give false information to the police in an attempt, however clumsy, to throw them off the trail as he perceives their attention focusing on him as a suspect, cannot resort later to a claim of coercion. See *Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978) ("the presence of several uniformed officers . . . alone" does not "necessarily compel[] such a finding" of coercion). Cf. *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984), quoting *Miranda* v. *Arizona, supra* at 445 (noting that "conversation [between police and defendant] took place during a friendly chat in the defendant's home with the defendant's voluntary acquiescence. Questioning in such an environment is far removed from the 'incommunicado interrogation of individuals in a police-dominated atmosphere' ").

The defendant's claim that his subsequent statements, made at the police station, were not voluntary is similarly without merit. See *Commonwealth* v. *LeBlanc, supra* at 553-555. The motion judge made comprehensive findings of fact that fully support his conclusions. We see no basis for rejecting them. See

*Commonwealth* v. *Waters*, 420 Mass. 276, 278 (1995), and cases cited.[11]

Because we reject the defendant's claims that his statements to the police at his home should have been suppressed, we need not consider his argument that his later statements should have been suppressed as "fruit of the poisonous tree." See *Commonwealth* v. *Painten*, 429 Mass. 536, 542 (1999). For the same reason, we reject the defendant's argument that the items seized from his house should be suppressed because the affidavit in support of the search warrant relied on statements made by the defendant that should have been suppressed. See *id.* See also *Wong Sun* v. *United States*, 371 U.S. 471, 484-485 (1963).

We also need not consider the defendant's argument that "the cat was out of the bag" when he gave his statements at the police station. There was no initial unlawful police action and no need to suppress any subsequent statements. See *Commonwealth* v. *Smith*, 412 Mass. 823, 831-832 (1992); *Commonwealth* v. *Watkins*, 375 Mass. 472, 482 (1978).

(b) *Fourth Amendment and art. 14.* Relying on *Commonwealth* v. *Krisco Corp.*, 421 Mass. 37, 46 (1995), the defendant claims, for the first time on appeal, that the statements he made to the police at his house were obtained in violation of his Fourth Amendment and art. 14 rights because the police transgressed the bounds of what he refers to as his "limited purpose" in allowing them to enter his house, and then remained after his "authorization" for the police to be in his house ended. There is no merit to the claim.

It is clear from the record that the police sought to enter the house to speak to the defendant and not to search the premises. Assuming, arguendo, that the police presence in the defendant's house that morning did constitute a "search," the limitations

---

[11]The defendant also claims that he was not informed of his right to use a telephone while he was being questioned by the police. The police are not required to inform the defendant that he is entitled to a telephone call until the defendant is arrested. See G. L. c. 276, § 33A. See also *Commonwealth* v. *Painten*, 429 Mass. 536, 542 (1999). Here, the defendant was advised of his right to a telephone call when he was booked at 3:43 P.M. Although the defendant was arrested at approximately 1 P.M., he immediately fainted and required medical attention. The defendant was properly advised that he was entitled to a telephone call when he was booked.

imposed by the Fourth Amendment and art. 14 do not require the suppression of statements made while a search — even one determined to be "unlawful" — was underway. See *Commonwealth* v. *Waters, supra* at 278 ("the suppression of a witness's testimony is relief well beyond the suppression of physical evidence and calls for a level of suppression that we are not inclined to recognize").

In any event the defendant's claim that his consent to a "search" was limited in scope and later withdrawn is not persuasive. See *United States* v. *Dichiarinte*, 445 F.2d 126, 129 n.3 (7th Cir. 1971) ("defendant's consent may limit the extent or scope of a warrantless search in the same way that the specifications of a warrant limit a search pursuant to that warrant"). The defendant argues that he invited the police into his house in response to their request to "talk" with him, and that they were required to leave after he told them he did not wish to say anything. But there was no reasonable basis for the police to infer that the defendant had limited, or withdrawn, his consent for them to be in his house. After the defendant said he did not wish to talk to the police, he did not ask them to leave. After Dorman and Morse went outside, he did not ask the two officers who remained inside to leave, and he did not object when Morse and Dorman reentered the house after inspecting his automobile. We see no basis to conclude that the defendant's invitation to the police to enter his house was circumscribed in any way. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 99 (1997) ("the defendant's father's words and actions placed no limitations on the scope of the entry to which he was consenting. He had said to the officers, 'Come on in,' led them into the house, and into the living room where the defendant sat"); *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 178 (1980) ("ultimate question is whether, in light of all the circumstances, a man of reasonable caution would be warranted in the belief that some limitation was intended by the consent giver").

All of the evidence obtained from the defendant — his statements to the police and the physical evidence later obtained pursuant to a search warrant — was properly admitted.

3. *The prosecutor's comments.* The defendant argues that the prosecutor improperly inquired about and commented on his

invocation of his right to remain silent.[12,13] See *Doyle* v. *Ohio*, 426 U.S. 610 (1976). Because the defendant did not object to any of the statements,[14] we consider whether the challenged comments, if improper, created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Fowler*, 431 Mass. 30, 42 n.20 (2000). They did not.

Pursuant to the Commonwealth's humane practice rule, a defendant may seek to convince a jury that incriminating statements he made to the police were not voluntary. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 150, cert. denied, 457 U.S. 1137 (1982). If the voluntariness of the statements is a "live issue" at trial, *Commonwealth* v. *Alicea*, 376 Mass. 506, 523 (1978), a jury may consider evidence of the circumstances surrounding the defendant's waiver of his right to remain silent. See *Commonwealth* v. *Tavares*, *supra* at 153 n.19, quoting *Com-*

[12]Specifically, the defendant challenges certain statements made by the prosecutor in his opening statement, direct examination of Morse, and closing argument. In his opening statement, the prosecutor said that the police "asked [the defendant] if he'd been home," adding, "At first he declined to talk to them," and "you will find that when [the defendant] was confronted by the police he first told them that he wasn't going to talk to them." Second, during his direct examination of Morse, the prosecutor first asked Morse to repeat for the jury the Miranda rights read to the defendant. He then asked Morse whether the defendant "respond[ed] in any way." Morse replied that the defendant "stated he thought it was best if he didn't say anything at that time." Last, during his closing argument, the prosecutor commented, "Well, when the police first arrived and said, 'There's been a homicide,' he said: 'Gee, I think I better not talk to you, I'd better not incriminate myself.' " He also told the jury that the defendant had "no good explanation" for the second registration plate on his automobile.

[13]The defendant invoked his right to remain silent before he was arrested, but after he had been advised of his rights. We analyze the prosecutor's comments as if they referred to the defendant's postarrest silence. See *Commonwealth* v. *Waite*, 422 Mass. 792, 797 (1996).

[14]During the direct examination of Morse, at a sidebar conference defense counsel told the judge that testimony of "a statement after [the defendant] asserted his Miranda rights" is "inadmissible," and requested that the prosecutor be instructed to "proceed directly to the part where [the defendant] made his statement, rather than dwell on the invocation of his rights." The judge ruled that the defendant's post-Miranda statement to the police was admissible under the humane practice rule because the defendant had asserted "that he wasn't properly given his Miranda rights." The judge said that he would instruct the jury that "a person has every right to remain silent." Defense counsel did not object to the ruling, and agreed that the judge should give such an instruction, but at a later point in time. See note 16, *infra*.

*monwealth* v. *Chung*, 378 Mass. 451, 458-459 n.9 (1979) ("[E]vidence bearing on whether warnings were given and rights were validly waived is 'relevant in determining whether a confession is voluntary' "). There are, moreover, "rare instances" where evidence of a defendant's postarrest, post-Miranda silence may be admissible. *Commonwealth* v. *DePace*, 433 Mass. 379, 383 (2001). In this case, a central focus of the defense was that the defendant's highly incriminating statements to the police were not voluntary, but elicited by the "coercive" tactics of the police. In these circumstances, the prosecutor could properly direct the jury's attention to whether warnings were given and the circumstances surrounding the defendant's waiver of his Miranda rights, see *Commonwealth* v. *Tavares, supra.* But the prosecutor should not have commented specifically on or inquired about the defendant's invocation of his right to remain silent unless and until the defendant himself placed that statement in evidence.

It was therefore error for the prosecutor in his opening statement to direct the jury's attention to the defendant's invocation of his right to remain silent. See note 12, *supra.* While the defendant had raised the issue of the voluntariness of his statements in his pretrial motions, the judge had determined that the statements were voluntary and admissible, and the prosecutor could not have known for certain that the defense would make voluntariness a live issue at trial.

As to the prosecutor's direct examination of Morse, see note 12, *supra*, at that point in the trial the defendant himself had not placed before the jury any evidence of his invocation of his right to remain silent.[15] Consistent with our humane practice rule, and to rebut the thrust of the defense that he had been "coerced" into making the incriminating statements, the prosecutor could bring to the jury's attention the warnings given to the defendant, the request by police to use the defendant's telephone, evidence of the number of police present in the house, and so on, without specifically commenting on the

---

[15]In his opening statement, defense counsel made no mention of the defendant's invocation of his right to remain silent, but defense counsel did emphasize the "coercive" tactics of the police force when the two sergeants and four patrolmen arrived at the defendant's home.

defendant's statement that he "[thought] it best if [he did not] say anything at this time." The judge should not have permitted the prosecutor to elicit that statement from Morse. See note 14, *supra.*

During the cross-examination of Morse, however, defense counsel himself explicitly and pointedly raised the defendant's invocation of his right to remain silent. In an effort to show that the defendant's post-Miranda, postinvocation statements were coerced by the police, defense counsel asked Morse, whether, in response to his advising the defendant of his Miranda rights, the defendant had said, "I think I'd better not say anything right now." Because defense counsel elicited this testimony, and because in his closing argument the prosecutor referred to the statement solely to challenge the defendant's claim of coercion, we conclude, on the unique facts of this record, that the prosecutor's reference in his closing statement to the defendant's invocation of his right to remain silent was permissible. The prosecutor did err in his closing statement, however, when he commented that the defendant had "no good explanation" for the second registration plate on his automobile. See note 12, *supra.* That comment did not concern the voluntariness of defendant's statements to the police, and should not have been made. It improperly placed a burden on the defendant to produce evidence. See *Commonwealth* v. *Fowler, supra* at 36-42.

Despite the improper comments made by the prosecutor, we conclude that reversal of the conviction is not required, for several reasons. First, we are hard pressed to conclude that the defendant's exercise of his right to remain silent was in fact used against him. See *Greer* v. *Miller,* 483 U.S. 756, 763 (1987), quoting *Wainwright* v. *Greenfield,* 474 U.S. 284, 291 (1986) (*Doyle* v. *Ohio,* 426 U.S. 610 [1976], "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will *not be used against him* and then using his silence to impeach an explanation subsequently after the trial' " [emphasis added]). See also *Commonwealth* v. *Waite,* 422 Mass. 792, 798 (1996). Defense counsel raised the issue of the voluntariness of the defendant's statements in his opening statement, and through cross-examination repeatedly sought to demonstrate that the defendant was confused and intimidated by the police. At the

close of evidence, the judge instructed that the defendant had no duty to produce any evidence or to testify on his own behalf, and it is a fair inference that the jury, having heard the defendant place in evidence his assertion of his right to remain silent, understood the reference as part of the defendant's argument that his later incriminating statements were coerced.[16] Moreover, the judge instructed the jury that opening and closing statements are not evidence. In light of these instructions, and the overwhelming evidence of the defendant's guilt, the prosecutor's improper comments and question did not cause a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Fowler, supra* at 42.

4. *The judge's evidentiary rulings and jury charge.* We agree with the defendant that certain testimony of a civilian witness, Richard Telford, should have been struck. For a brief period Telford had acted as an informal counsellor to the defendant. He described various conversations he had with the defendant and also testified that he (Telford) had told the defendant's estranged wife (the victim) that his own wife "had access to a safe house . . . if she would make a phone call to my wife," suggesting that Telford believed the wife was in danger from the defendant.[17] Defense counsel immediately objected, and moved to strike the testimony. The judge sustained part of the objection, but allowed evidence of Telford's statements to the wife. The judge also gave a limiting instruction to the effect that Telford's statement to the wife was to be considered only for the fact that it was said to her. Telford's statement should not have been admitted, even as limited by the judge. It was a lay person's intimation that the defendant was a danger to his wife, and not admissible for any relevant purpose. However, when viewed in the context of the substantial evidence of the

---

[16]The judge earlier had informed defense counsel that he would explicitly instruct the jury that the defendant had "an absolute right to remain silent" and that they were to draw "no inference from the fact that a defendant elects to exercise that right." During the trial the judge twice offered to give that instruction. Defense counsel twice declined the judge's offer, and the judge informed the defense counsel to alert him if defense counsel later sought the instruction. He never did.

[17]Telford also testified that the defendant informed him that he (the defendant) wanted to hurt his wife and became angry when talking about their marriage.

defendant's hostility toward his wife, which necessitated her seeking and obtaining a protective order against him, we conclude that "the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).[18]

The defendant also argues, for the first time on appeal, that the judge erred in certain of his jury instructions. First, the defendant claims that the judge did not give a proper "humane practice" instruction, see *Commonwealth* v. *Benoit*, 410 Mass. 506, 512 (1991); *Commonwealth* v. *Tavares*, *supra* at 152, because he did not inform the jury that they must consider whether the defendant's statements to Telford, a civilian witness, were voluntary. See *Commonwealth* v. *Allen*, 395 Mass. 448, 456-457 (1985) (holding that jury must determine voluntariness of statements to both private citizens and police). The judge acted properly. The humane practice instruction applies only to "admissions or confessions made after the crime is committed" and not to statements made to an acquaintance prior to a killing. *Commonwealth* v. *LaCava*, 438 Mass. 708, 720 n.12 (2003), and cases cited.

As to his second challenge, the Commonwealth concedes that the judge gave an incorrect instruction on malice for conviction of murder on a theory of deliberate premeditation. Because the jury were correctly instructed on the elements of murder by reason of extreme atrocity or cruelty, and because the jury convicted the defendant of murder in the first degree for both homicides on that theory, as well as on the theory of deliberate premeditation, the defendant was not prejudiced by the error. See *Commonwealth* v. *Blackwell*, 422 Mass. 294, 300 (1996).

Finally, the defendant argues that immediately after defense

---

[18]The defendant also challenges the admissibility of Telford's statement, "I believe he [the defendant] needed professional help and that he should seek it." That statement was properly admitted as a lay person's summary description of the defendant's emotional condition regarding his marriage. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence §§ 7.4, 7.5 (7th ed. 1999 & Supp. 2003). The judge instructed the jury that the statement was not admitted for the truth of the matter asserted, and we trust that the jury abided by the judge's instructions. See *Commonwealth* v. *Martinez*, 431 Mass. 168, 174 (2000). There was no error.

counsel impeached Sergeant Detective Horsley with his grand jury testimony, the judge should have instructed the jury that such testimony could be used for substantive purposes. See *Commonwealth* v. *Daye*, 393 Mass. 55, 75 (1984).[19] The defendant concedes that the judge later properly instructed the jury on the issue during his final charge. The judge was not required to give the instruction before his final charge to the jury. In any event, during testimony, Horsley acknowledged the truth of his prior statement to the grand jury, rendering any instruction at that time largely superfluous.

5. *Motion for a new trial.* In his motion for a new trial, the defendant claimed that his trial counsel was ineffective at his sentencing because counsel did not suggest to the judge that the defendant's psychiatric condition should be considered as a mitigating factor.[20] Rather, his counsel gave a cursory two-sentence explanation as to why the defendant should not serve consecutive life sentences. We conclude that a more extensive recitation of the defendant's situation was not likely to "affect the sentences imposed." *Commonwealth* v. *Lykus*, 406 Mass. 135, 146 (1989). From the numerous pretrial hearings and court orders concerning the defendant's psychiatric condition and the hearing to determine the defendant's competency to stand trial, the judge was clearly aware of the defendant's psychiatric history. Cf. *Commonwealth* v. *Mamay*, 407 Mass. 412, 425 (1990) (noting that judge had been exposed to potential mitigating factors and that presentation again at sentencing would have been redundant).[21] In these circumstances, defense counsel's decision to offer a brief explanation of the defendant's situation

---

[19]The grand jury testimony, which satisfied the requirements of *Commonwealth* v. *Daye*, 393 Mass. 55, 73-75 (1984), for admission for substantive purposes, concerned the defendant's demeanor on November 2, 1989.

[20]Rule 28 (b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 898 (1979), provides, in pertinent part: "Before imposing sentence the court shall afford the defendant or his counsel an opportunity to speak on behalf of the defendant and to present any information in mitigation of punishment."

[21]It is apparent from the transcript that the defendant was upset, unruly, and prone to outbursts in the court room. As the verdicts were handed down, the defendant interrupted the proceedings, saying, "The system is guilty. . . . The system is guilty of raping me." Throughout the trial and pretrial hearings, despite the defendant's numerous outbursts, his counsel was effective in controlling him. The judge could not have been unaware of this behavior.

was not unreasonable. We note, as well, that the defendant faced two mandatory sentences of life in prison, see G. L. c. 265, § 2, and counsel did request that the judge impose concurrent sentences. Cf. *Commonwealth* v. *Montanez,* 410 Mass. 290, 298 (1991) ("More importantly, counsel never requested concurrent rather than consecutive sentences").

The defendant also argues that the judge should have authorized counsel to retain a psychiatrist to assist him in evaluating the psychiatric records so that counsel could determine whether there were other substantive issues to pursue on appeal. We considered and rejected that argument in *Commonwealth* v. *Serino,* 436 Mass. 408, 415 (2002) ("A defendant is not entitled to receive funds to prosecute a motion for a new trial, even where that motion raises a claim of ineffective assistance of counsel").

6. *G. L. c. 278, § 33E.* We have reviewed the entire record in this case as required by G. L. c. 278, § 33E. We conclude that the jury's verdicts were fully supported by the evidence and the law. The interests of justice do not require either a new trial or the entry of verdicts of a lesser degree of guilt. The verdicts stand.

*Judgments affirmed.*

*Order denying motion
for a new trial affirmed.*