# United States Court of Appeals
## For the First Circuit

No. 06-1117

MICHAEL CAPUTO,

Petitioner, Appellant,

v.

KENNETH NELSON, Superintendent,
Bridgewater State Hospital,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,

and Stafford,* Senior District Judge.

John J. Courtney for appellant.
Maura D. McLaughlin, Assistant Massachusetts Attorney General,
with whom Thomas F. Reilly, Massachusetts Attorney General, was on
brief, for appellee.

July 26, 2006

*Of the Northern District of Florida, sitting by designation

**Stafford, Senior District Judge.**     In 1991, a Massachusetts Superior Court jury convicted Michael Caputo ("Caputo") on two counts of first-degree murder.  Caputo appeals the district court's order denying his petition for writ of habeas corpus by a person in state custody.  Because the state court decision affirming his conviction was neither contrary to, nor an unreasonable application of, clearly established federal law, we affirm.

## I.

In the early morning hours of November 2, 1989, two Boston police officers were dispatched to a second-floor apartment in the Jamaica Plain neighborhood of Boston.[2]  In the apartment's bedroom, the police found the bodies of Caputo's estranged wife and mother-in-law.  Caputo's wife had been stabbed twenty-two times, his mother-in-law seventeen times.  Caputo's two young daughters, who were unharmed, were also found in the apartment.

Noting an open kitchen window that led to the back porch, the police discovered that the telephone wires to the apartment had been cut.  There was no sign of forced entry.  On the dining room table, the police found a protective order dated July 31, 1989, ordering Caputo to refrain from abusing his wife and to stay away

---

[2] The facts, which are not challenged by Caputo, are taken from the Massachusetts Supreme Judicial Court's recitation of the facts. Commonwealth v. Caputo, 786 N.E.2d 352, 355-58 (Mass. 2003).

from the Jamaica Plain apartment. The order contained Caputo's address in Plymouth, Massachusetts.

After the Boston police notified the Plymouth Police Department that Caputo was a suspect in a double homicide, six Plymouth police officers, including Sergeant Thornton Morse ("Morse") and Sergeant Richard Dorman ("Dorman"), arrived at Caputo's house. Caputo opened the front door after the officers repeatedly knocked on the front and rear doors. Morse and Dorman introduced themselves, then asked whether they could enter the house to speak with Caputo. Caputo acquiesced.

Once inside the house, Dorman informed Caputo that they were investigating a double homicide on behalf of the Boston Police Department. From a printed card, Dorman read Caputo his rights under Miranda v. Arizona, 384 U.S. 436, 467-73 (1966). When Dorman asked Caputo whether he understood his rights, Caputo initially replied: "No." Dorman then repeated each right, asking after each whether Caputo understood. Caputo replied affirmatively to each, then said that he thought it best if he said nothing further. The officers immediately stopped all questioning of Caputo. They were not, however, asked to leave the house.

After Dorman informed Caputo that they were investigating a double homicide, Caputo asked Dorman who had died. Dorman replied that he did not know. Soon thereafter, wanting to obtain more information about the investigation to pass along to Caputo,

Morse asked whether he could use Caputo's telephone to call the Plymouth police station. Caputo agreed that Morse could use his phone. At the conclusion of his call to the station, Morse informed Caputo that the Plymouth police could not then supply any additional information about the double homicide.

Leaving some of the officers inside the house, Dorman went outside to examine the automobile parked in Caputo's driveway. The vehicle matched the description given to the Plymouth police. The hood was warm to the touch, and a registration plate with a number other than Caputo's registration number covered the automobile's assigned registration plate. It was later learned that the outer registration plate had been stolen from a vehicle in the Jamaica Plain section of Boston.

When he re-entered the house, Dorman asked whether he could use Caputo's telephone to again call the Plymouth police station. Caputo again agreed. Within Caputo's hearing, Dorman informed the lieutenant on the line that Caputo was at his residence, that the engine of Caputo's automobile was warm, and that there were two different registration plates on the automobile. Spontaneously, Caputo stated that he did not want to incriminate himself but that he had a story to tell. He then proceeded to tell the officers that two men kidnapped him after forcing their way into his home the night before and that he later awoke "in a daze" in the Braintree area wearing only his underwear. The officers did not ask

any questions in response to Caputo's unelicited statements.

At the request of the officers, Caputo agreed to accompany the officers to the Plymouth police station. At the station, Caputo was once more advised of his Miranda rights. Indeed, he was given a written copy delineating each right. Caputo read the form, making a check mark after each right. When asked whether he wished to talk to the officers, Caputo replied: "I'm not sure; I don't know if I should say anything or not. What should I do?" Morse responded: "I can't tell you that, but I want you to be aware of your rights and that you do not have to say anything to me."

Yet again, Morse informed Caputo of his Miranda rights, ascertained that Caputo understood his rights, and asked Caputo whether he wished to speak to the police. Then, and only then, Caputo began to elaborate on the statement he had previously made in his home. Among other things, Caputo told the officers that he remembered having blood on him, throwing an object out of his automobile, and, at some point during the night, being outside his mother-in-law's home.

At approximately 9:20 A.M., Sergeant Detective Charles Horsley ("Horsley") of the Boston Police Department arrived at the Plymouth police station. Informed that Caputo had been read his Miranda rights, Horsley interviewed Caputo for approximately forty-five minutes. When asked whether he had anything to do with the

-5-

murders, Caputo became upset and stopped talking. Caputo asked to leave the police station but was informed that he was under arrest.

Later that same afternoon, the police executed a search warrant at Caputo's residence. They recovered a knife set from which one knife was missing. A pair of "tin snips" capable of cutting telephone wires was found in Caputo's automobile.

On November 17, 1989, Caputo was charged in two indictments with the first-degree murders of his wife and mother-in-law. Before trial, Caputo moved to suppress the statements that he made at his home and at the police station. After an evidentiary hearing, the motion judge denied Caputo's motions. The judge found that, on entering Caputo's house, the officers immediately informed Caputo of his Miranda rights, then ceased all questioning when Caputo indicated that he did not want to speak to them. The judge also found that, at the Plymouth police station, after he again received full and complete Miranda warnings, Caputo knowingly waived his Miranda rights before he voluntarily answered police questions.

On March 21, 1991, a jury found Caputo guilty of two counts of first-degree murder. He was sentenced that same day to two consecutive life sentences. The judgments were affirmed by the Supreme Judicial Court of Massachusetts ("SJC") on April 15, 2003.

In rejecting Caputo's claims on appeal, the SJC explained:

> First, before he made any statement, [Caputo] received and acknowledged that he understood

his Miranda rights. Second, when [Caputo] indicated a wish not to speak to the police, all questioning ceased. It was only after he overheard the police conversation that [Caputo] stated, unprovoked, that he had been kidnapped the previous night. We do not agree with [Caputo] that his statement should be suppressed because the police officer's request to use his telephone was "reasonably likely to elicit an incriminating response" from [Caputo], and therefore the "functional equivalent" of an interrogation. The telephone call was a report and request for further information, an action "normally attendant" to police procedures. [Caputo's] statement occurred only after and apparently because he had overheard the telephone conversation that tended to implicate him, not because of any "interrogation."

. . . [Caputo] gave his consent to the police to enter his home, he did not ask them to leave, and spoke to them only after he recognized that the police had seen potentially incriminating evidence outside. A defendant who is "nervous" because he is in the presence of police within hours of committing murder and who chooses to give false information to the police in an attempt, however clumsy, to throw them off the trail as he perceives their attention focusing on him as a suspect, cannot resort later to a claim of coercion.

. . .

Because we reject [Caputo's] claims that his statements to the police at his home should have been suppressed, we need not consider his argument that his later statements should have been suppressed as "fruit of the poisonous tree."

Commonwealth v. Caputo, 786 N.E.2d 352, 358-59 (Mass. 2003) (footnote and citations omitted).

On April 12, 2004, Caputo filed a petition for writ of habeas corpus in federal court. The district court entered judgment for the respondent on December 5, 2005, and this timely appeal followed. The district court thereafter issued a certificate of appealability, limiting the appeal to Caputo's claim that his privilege against self-incrimination was violated when his statements were introduced at trial.

II.

We review the federal district court's denial of Caputo's petition for writ of habeas corpus de novo. Correia v. Hall, 364 F.3d 385, 387 (1st Cir. 2004).

Because Caputo's habeas petition was filed after April 24, 1996, this court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). As amended, AEDPA precludes the granting of habeas relief to a state prisoner unless the state court decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Notably, the federal habeas court shall presume that the state court's determination of factual issues is correct, although the petitioner may rebut the

presumption of correctness by clear and convincing evidence.  Id.

A state court acts "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000) (Justice O'Connor's Part II majority opinion). A state court's decision involves an "unreasonable application" of clearly established federal law if it correctly identifies the governing legal principle from the Supreme Court's decisions but then unreasonably applies that principle to the facts of the prisoner's case.  Id.  An "unreasonable" application, moreover, is an "objectively unreasonable" application.  Id., 529 U.S. at 409.

III.

Caputo contends that his conviction was obtained through evidence that was obtained in violation of the Fifth Amendment privilege against self-incrimination.  Specifically, he argues that the statements he gave to the police at his house were not the product of a voluntary waiver of his Miranda rights but were the product of police tactics intended to elicit an incriminating response from him.  He also argues that the statements he made at the police station, after he signed a waiver form, were the "fruit of the poisonous tree," his earlier statements having been involuntarily made.

-9-

In Miranda, 384 U.S. at 467-73, the Supreme Court held that a person in custody must be warned prior to interrogation that he has certain rights, including the right to remain silent. Once a person in custody invokes his Miranda protections, the government cannot use any evidence obtained through custodial interrogation unless the suspect knowingly waives his rights. Id. at 479. The term "interrogation" under Miranda refers not only to express questioning but also "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Here, Caputo contends that the police officer's use of Caputo's telephone, in Caputo's presence, to relay information about what the officers found at Caputo's residence was the functional equivalent of interrogation because it was "reasonably likely to elicit an incriminating response" from Caputo after he had claimed his right to remain silent. Citing Miranda, Caputo maintains that the story he blurted out upon hearing the officer's telephone conversation should have been suppressed as the product of that allegedly unlawful interrogation. Like the SJC, we are not persuaded.

In Innis, in the presence of a man arrested on suspicion of armed robbery, while conversing about the missing shotgun used

-10-

in the robbery, two police officers expressed concern that a child might injure herself if, by chance, she found the missing weapon. This musing between the officers prompted the suspect to reveal the location of the weapon. In holding that the police officers did not engage in the functional equivalent of interrogation, the Supreme Court wrote:

> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

Innis, 446 U.S. at 303.

Since Innis, a number of courts have considered whether police may confront a suspect with evidence against him without engaging in the functional equivalent of interrogation. For example, in United States v. Payne, 954 F.2d 199 (4th Cir. 1992), cert. denied, 503 U.S. 988 (1992), the defendant made incriminating statements after a law enforcement officer informed the defendant that the FBI possessed inculpatory evidence against him. Rejecting

-11-

the defendant's argument that the officer's statement constituted the functional equivalent of interrogation, the Fourth Circuit observed: "[T]he Innis definition of interrogation is not so broad as to capture within Miranda's reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." Id. at 202. The court went on to explain:

> That no comment on the evidence in a case will ever issue in the presence of a criminal suspect seems to us neither realistic nor desirable as an absolute rule derived from the Fifth Amendment. Indeed, it may even be in the interest of a defendant to be kept informed about matters relating to the charges against him. . . . Information about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow.

Id.; see also United States v. Thomas, 11 F.3d 1392, 1397 (7th Cir. 1993) (finding no functional equivalent of interrogation where a police officer provided information about the results of his investigation to a suspect who had herself asked the officer to let her know such results).

Similarly, in Plazinich v. Lynaugh, 843 F.2d 836 (5th Cir.), cert. denied, 488 U.S. 1031 (1989), the Fifth Circuit rejected the defendant's argument that a policeman engaged in the functional equivalent of interrogation when he informed the defendant--after the defendant invoked his Miranda rights--that the

-12-

defendant's accomplice had attempted suicide by slashing her wrists in the jail.  Citing Innis, the court wrote:

> [The officer's] information concerning [the defendant's accomplice] was not objectively likely to elicit an incriminating response from the suspect, who had just minutes before declined to be interrogated.  In the brief and informal context in which it was made, the comment could at most be characterized as offering [the defendant] food for thought rather than seeking to provoke an incriminating response.

Id. at 840 (internal quotation marks omitted); see also Enoch v. Gramley, 70 F.3d 1490, 1500 (7th Cir. 1995) (finding no functional equivalent of interrogation where the police identified the victim to the suspect and briefly stated the evidence against him), cert. denied, 519 U.S. 829 (1996).

In this case, Caputo volunteered false exculpatory information after hearing Dorman report to his shift commander that Caputo was at his residence, that the engine of Caputo's automobile was warm, and that there were two different registration plates on the automobile.  Dorman did not pose any questions to Caputo, and he did not otherwise engage in subtle efforts to get Caputo to talk.  Instead, he simply related to another law enforcement officer non-evocative facts about what he saw at Caputo's residence.  Dorman had no reason to know or even suspect that, in response to his brief telephone call to the Plymouth police station, Caputo would spontaneously blurt out a fabricated story intended to be exculpatory and explanatory.  Consistent with the case law set out

-13-

above, the SJC determined that Caputo was <u>not</u> subjected to the functional equivalent of interrogation, and his Fifth Amendment right against compelled self-incrimination was <u>not</u> violated, when Dorman used Caputo's telephone, in Caputo's presence, to report what was found at Caputo's residence.  Finding no Fifth Amendment violation when Caputo made his initial statements, the SJC determined that Caputo's later statements could not have been "fruit of the poisonous tree."  The SJC thus upheld the trial court's denial of Caputo's motion to suppress.

When reviewing the SJC's decision upon Caputo's petition for federal habeas corpus relief, the district court concluded that the SJC properly applied the holdings of <u>Miranda</u> and <u>Innis</u> and, consequently, reached a decision that was neither contrary to, nor an unreasonable application of, Supreme Court precedent.  We agree with the district court's conclusion and, accordingly, AFFIRM the judgment of the district court, denying Caputo's petition for writ of habeas corpus.