COMMONWEALTH *vs.* JOHN R. LEBLANC.

Worcester. February 9, 2001. - March 20, 2001.

Present: GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Waiver, Voluntariness of confession. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver.*

A Superior Court judge correctly concluded that the Commonwealth had demonstrated, beyond a reasonable doubt, that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights after turning himself in at the police station [553-554], and that the defendant confessed voluntarily and the confession was not the product of interrogation or promises that had overborne his will [554-556].

INDICTMENTS found and returned in the Superior Court Department on September 10, 1996.

A pretrial motion to suppress evidence was heard by *Ralph D. Gants*, J., and the cases were tried before him.

*Richard J. Shea* for the defendant.

*Sandra L. Hautanen,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant on two indictments charging murder in the first degree, for the bludgeoning deaths of two young women. The defendant appeals from his convictions, claiming that his statement to the police in which he confessed to the murders was involuntary due to his extreme emotional disturbance at the time, and so should have been suppressed. The defendant also asks that we exercise our power under G. L. c. 278, § 33E, to reduce his convictions to a lesser degree of guilt, or to grant him a new trial, because the evidence at trial showed that he was highly intoxicated by drugs or alcohol at the time of the murders. We find no error and no basis to grant relief under G. L. c. 278, § 33E. Accordingly, we affirm the judgments of conviction.

The relevant facts and background are as follows. Two teenagers, April C. and Jaimee S., disappeared on August 1, 1996. Five days later, their badly decomposed bodies were found off a narrow dirt road in a wooded area in Sturbridge. The police sought, but could not find, the defendant, in whose company the two young women were last seen. The case attracted much attention in the media.

On August 8, 1996, the defendant's mother flagged down an officer with the Sturbridge police department, who was driving by her home. At her request, the officer went inside, where the defendant was waiting. The defendant stated that he would like to speak with the officer. After instructing a media crew that had been outside the home to leave, the officer informed the defendant that, for his own safety, it would be advisable to talk at the police station. The defendant agreed and, in order to avoid attracting media attention, lay in the back seat of the cruiser during the short trip to the police station. There, the defendant confessed to killing April and Jaimee.

The defendant was questioned by a State trooper, in the presence of the Sturbridge police officer who had accompanied him to the station. He told the trooper that he had "been drinking that day [August 1]," but not how much, and also had ingested the drug Xanax. He stated that he had driven April and Jaimee in his dump truck down a dirt road by a recycling plant in Sturbridge, stopping at a pile of logs. According to the defendant, the two women threatened to accuse him of rape, and Jaimee lunged at him, scratching him on the hand. The defendant then "got mad and lost control." He jumped out of the truck and grabbed a log "about four inches around and six feet long" and weighing about twenty pounds. When Jaimee stepped out of the truck, the defendant swung the log with both hands, hitting her two or three times in the head. At this point, the defendant recounted, April was out of the truck, calling him names, so he turned and hit her in the head as well. He then poked at April's body "with the sharp end of the stick" and threw both bodies down a nearby gully. The defendant told the police that he then drove home and went to sleep.

The defendant filed a motion to suppress his statements. After

an evidentiary hearing,[1] a judge in the Superior Court (who also presided at the defendant's trial) denied the defendant's motion in a written memorandum of decision. The following is a summary of the judge's extensive findings of fact concerning the circumstances in which the defendant made his contested statements.

At the time the defendant accompanied the police officer to the station, he was not handcuffed and was not under arrest. The color of his face appeared normal, and nothing about him seemed out of the ordinary. He first stated that he had not seen April or Jaimee in a long time. The officer knew that the defendant was lying on this point (several people had reported seeing him with the two women on the day they disappeared), and, thus, the decision was made to arrest him. The defendant was advised of, and waived, his Miranda rights.

When initially told that he had been seen with April and Jaimee, the defendant began to slump in his seat, and his face became red. To the two police officers who conducted the interrogation, he appeared distraught. Several times he asked for help for his emotional problems, and was told that he might be able to see a court psychologist ("it's up to the judge to decide, but lot of times they go for an evaluation and you could seek help that way"). According to one of the officers, who had known the defendant for approximately fifteen years and had observed him under the influence of drugs to varying degrees, the defendant did not appear to be under the influence of drugs, medication, or alcohol. Although he was in emotional turmoil when asked about the murders, the defendant seemed to be in control of himself. At no time during the interview did the defendant request counsel or make any statement that fairly could be interpreted to constitute a request for counsel.

Shortly after signing the Miranda card, the defendant picked up a bullet that lay on top of an unoccupied desk, put it in his mouth, and swallowed it. Initially, the defendant would not say what the object was, and only later in the interview did he tell the officers that it was a bullet. After swallowing the bullet,

---

[1] The judge heard the testimony of the defendant's mother, as well as the State trooper and the Sturbridge police officer who were present when the defendant gave his statement. The defendant did not testify at the hearing.

before confessing, the defendant made comments about it not mattering anymore, that he would not be around long. His demeanor also changed after swallowing the bullet; he seemed not to care anymore. The judge found that the defendant's swallowing of the bullet was intended by him as a suicide attempt.[2]

Approximately forty-five minutes into the interview, the defendant admitted that he had killed the two women. The defendant first told the police his story in narrative fashion, then repeated it slowly, responding to questions, so that it could be handwritten.[3] During the booking process a short time later, the defendant stated that he had taken no medication, drugs, or alcohol that day. The defendant was quoted as saying, "I don't even think I smoked a joint today."

The judge determined that the defendant was not under the influence of drugs or medication at the time that he confessed. He specifically rejected testimony of the defendant's mother that, shortly before he went to the police station, the defendant told her he had taken Xanax, and that he had appeared dazed and willing to accede to anything asked of him.[4] The judge further noted that the defendant's detailed narrative description of the killings belied the assertion that he was compliant or easily led. (In the judge's words: "[T]his confession is a world apart from one where the defendant simply accedes to repeated leading questions.") The judge did not find credible the defendant's affidavit to the effect that, when he confessed, he did not understand that he was suspected of a crime.

Although the defendant was nervous and anxious during the questioning (which, the judge noted, would be natural), the

[2]No medical assistance was sought for the defendant after he swallowed the bullet. One officer, a former emergency medical technician, testified that he knew that the bullet would pass safely through the defendant's intestines, and posed no medical risk to the defendant.

[3]This interview was not videotaped or audiotaped, which the judge determined conformed to the routine practice of both the State police and the Sturbridge police department.

[4]The judge reasoned that the defendant's mother would not have made affirmative efforts to surrender her son to the police based on a threatened manhunt of him as the killer of two young women, or allowed him to accompany a police officer alone to the police station, if she believed that, as a result of taking medication, her son was so sedated and compliant that he would do anything anyone asked him to do.

judge determined that the questioning itself was neither unfair nor coercive. When the defendant asked for help, he was speaking about his need for emotional help, not requesting counsel, and the judge found that there was no question of a "quid pro quo," whereby the police would provide psychological help to the defendant in return for his waiver or confession. According to the judge, the significance of the defendant's swallowing of the bullet lay not in his inability intelligently to waive his Miranda rights or to make a voluntary confession, but in the fact that it made it easier for him to confess because it "allowed him to rationalize that he would not be around to face the legal consequences of his actions."

The judge concluded that (1) although the defendant was not in custody when the police interview first began, he was in custody after he denied having seen the two women, which one officer knew to be false and which instigated the more aggressive questioning; (2) the defendant was informed of his Miranda rights, and knowingly, intelligently, and voluntarily waived these rights; (3) the defendant's statements, beyond a reasonable doubt, were made voluntarily; and (4) the failure of the police to have recorded his confession electronically did not warrant its suppression.[5]

1. The defendant does not challenge the judge's findings of fact. He argues only that his statements, as well as the waiver of his Miranda rights, were unintelligently made and involuntary as matter of law, because he had a background of heavy alcohol and drug abuse, and spoke in custody only after forty-five minutes of emotional distress, which included several requests for help and a suicide attempt. He also asserts that the promise that he might see a court psychiatrist, in response to his expressed need for help, was a form of coercion.

Testing the validity of incriminating statements made by a defendant who is in custody involves a two-fold inquiry: (1) whether there has been a knowing and intelligent waiver of

---

[5] It was the failure to record the defendant's statement electronically that was the primary grounds for the defendant's motion to suppress. The judge's ruling, concluding that the lack of recordation would not invalidate the confession, was correct. See *Commonwealth* v. *Ardon*, 428 Mass. 496, 498 (1998); *Commonwealth* v. *Fernandes*, 427 Mass. 90, 98 & n.3 (1998).

Miranda rights and (2) whether the statements were voluntary and not the result of coercion or intimidation. *Commonwealth* v. *Freeman*, 430 Mass. 111, 114 (1999), and cases cited. "Voluntariness turns on the 'totality of the circumstances,' including promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). A reviewing court grants substantial deference to a judge's ultimate conclusions, if warranted by the evidence, but conducts an independent inquiry to ascertain whether the judge correctly applied the law in a given case. *Id.* at 412-413.

The judge properly ruled that the Commonwealth had met its burden of proving, beyond a reasonable doubt, that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights. There was no evidence of intimidation, coercion, or physical force. See *Commonwealth* v. *Mello*, 420 Mass. 375, 384-385 (1995), and cases cited. The defendant turned himself in, apparently because he wanted to make a statement to the police. The judge found that there was no credible evidence that the defendant was under the influence of drugs or alcohol at the time he made the statement. There is no evidence that the defendant hesitated before signing the Miranda card, and the judge specifically rejected the defendant's affidavit which indicated that he did not understand the warnings. (The judge found that he had been given Miranda warnings several times in the past.) The defendant's requests for psychological help, under these circumstances, are not a factor in this determination, because the judge specifically found that they were not made until after the Miranda waiver.

For the same reasons, the judge was also warranted in concluding beyond a reasonable doubt that the defendant's confession was made voluntarily. A statement is voluntary if it is the product of a "rational intellect" and a "free will," and not induced by physical or psychological coercion. See *Commonwealth* v. *Selby*, 420 Mass. 656, 662, 663 (1995), *S.C.*, 426

Mass. 168 (1997); *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988), *S.C.*, 410 Mass. 680 (1991). See also *Commonwealth* v. *Selby*, *supra* at 663, citing *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 539 (1990) (statement involuntary when the "will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act"). The fact that a defendant may have been in a disturbed emotional state, or even suicidal, does not automatically make statements involuntary. See *Commonwealth* v. *Perrot*, 407 Mass. 539, 542, 543 (1990) (statements voluntary even though defendant had asked for gun to kill himself); *Commonwealth* v. *Libran*, 405 Mass. 634, 638, 639 (1989) (waiver voluntary in spite of defendant's "schizophrenic reaction" and "manic depressive condition"). It is true that the fact that the police were aware of a defendant's history of substance abuse and emotional problems could support, in adequate circumstances, a finding of involuntariness, if the defendant had appeared to be out of control. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 177 (1984) (statement by someone who "by dint of physical or mental impediments is incapable of withholding the information conveyed" cannot be used as evidence against him). This situation was not the case here. Although the defendant was emotionally upset, he spoke calmly when giving his statement, and there is no evidence that he was acting irrationally. Contrast *Commonwealth* v. *Magee*, 423 Mass. 381, 386-387 (1996) (statements involuntary after seven hours of prolonged questioning, while defendant, in exhausted state, cried, and shook uncontrollably).

During the approximately forty-five minutes from the time the defendant waived his Miranda rights until he admitted the murders, there is no evidence that the police pressured him to confess. The judge specifically found that no promises for psychological help were made to the defendant in return for his confession. See *id.* When he did decide to tell his story, he narrated his version of the events, and then repeated it slowly and carefully, so that the State trooper could write it down accurately. Assessing the totality of relevant circumstances, we conclude that the defendant's detailed confession was a free and voluntary act and was not the product of "inquisitorial activity"

that had overborne his will. *Commonwealth* v. *Williams*, 388 Mass. 846, 856 (1983).[6]

2. The defendant has set forth nothing to persuade us, under G. L. c. 278, § 33E, either to reduce his convictions of murder in the first degree to a lesser degree of guilt or to order a new trial. The defendant drove two teenagers to a wooded area and bludgeoned them to death. Although there was evidence of his intoxication on the night of the murders, there was conflicting evidence as to the extent of his intoxication.[7] The judge properly instructed the jury on the issue of intoxication, see *Commonwealth* v. *Doucette*, 391 Mass. 443, 455 (1984), and the jury decided the issue in favor of the Commonwealth.

A forensic expert witness testified that Jaimee sustained a great deal of fracturing and damage to her skull, made by a "fairly massive object [with a] fair amount of force with it." She also testified that April had "two large areas of impact" to

[6]The judge gave the jury humane practice instructions before the testimony of the State trooper who conducted the interview, and who read the defendant's statement into evidence. From this witness and from the Sturbridge police officer who was present during the interview, the jury heard essentially the same evidence regarding the circumstances in which the statement was made that was presented at the hearing on the motion to suppress. The jury were also given humane practice instructions before the testimony of a forensic chemist who overheard statements made by the defendant during his booking procedure. The defendant's trial counsel persistently and aggressively cross-examined these witnesses on the defendant's emotional state at the time and on the police's failure to record the defendant's statement electronically. Further, the defendant's trial counsel vigorously argued to the jury in his closing arguments that the Commonwealth had failed to prove that the defendant's statement was voluntarily made. The judge repeated the humane practice instructions before the jury began its deliberations.

During the course of the trial, then, the judge gave the jury humane practice instructions three times. The jurors thus were aware that, in order to consider the defendant's statement as evidence, they must first determine that the statement was indeed made by the defendant, and that the Commonwealth had proved, beyond a reasonable doubt, that it was freely and voluntarily given. They were also made aware, as part of the judge's instructions, that if the defendant had a mental impairment, or was under the influence of alcohol or drugs, they must take special care in their determination whether the statement was made freely and voluntarily.

[7]Two witnesses, who saw the defendant with April and Jaimee shortly before they disappeared, testified that the defendant appeared to be intoxicated at the time, but their descriptions as to the degree of his state of intoxication varied from "really messed" to a "little bit more than medium [intoxicated]."

her skull, as well as fractures to her arm, and the back of her hand, indicating that she attempted to defend herself from the blows. The medical examiner stated that both women could have lived for about eight minutes after the fatal blows and would have felt pain. There was more than sufficient evidence to convict the defendant of murder in the first degree of both Jaimee and April, and there is no basis to disturb the just verdicts rendered by the jury.

*Judgments affirmed.*