Lu, John T., J.
INTRODUCTION
The defendant, Kenneth Scott Richards (Richards), moves to suppress statements that he made in the presence of, or to, police, including a statement to medical personnel at the Anna Jacques Hospital Intensive Care Unit (I.C.U.), and two tape-recorded statements he made directly to police, all on June 23, 2006. Richards claims that the statements were elicited in violation of Miranda, and were involuntary. The court conducted an evidentiary hearing on May 1, 2007, at which Massachusetts state police Trooper Robert LaBarge (LaBarge), nurses Donna Doherty-Foumier (Doherty) and Anne Marie St. Cyr-Rolfe (St. Cyr), and Rowley police Sergeant Stephen May (May) testified. Counsel agreed that the court should listen to the audio recordings of Richards’s statements to the police.
Finding that there was no police misconduct, and, that, although Richards was impaired by drugs during the statement to medical personnel and the first police statement, given the legal standard established by appellate authority, the lack of police misconduct in eliciting the statements (indeed, the conversational tone of questioning) and the short length of questioning, the court finds that there was a knowing and voluntaiy waiver of Miranda and that the statements were voluntary, findings that the court makes beyond a reasonable doubt. The court rejects Richards’s other claims and denies the motion to suppress.
FINDINGS OF FACT
Based on the evidence presented and reasonable inferences from the evidence, the court makes the following findings of fact.
1. On June 23, 2006, Rowley police, including May, were called to the Richards’s home, an apartment in a condominium complex in Rowley. When May arrived officer Jeffrey French (French) was already there.
2. Police found Richards’s young daughter Samantha Richards in the apartment and quickly removed her. When May entered a bedroom, he found the bed in disarray and covered in blood and on the bed an unconscious man, Richards, and an unconscious woman, Richards’s wife Rachel Richards.
3. French, an emergency medical technician, tried to help the woman and told May how to attend to the man’s wounds. French then told May that Rachel Richards was dead.
4. May recognized Richards as an engineer for the Massachusetts Highway Department and someone he had spoken to about a dispute involving a neighbor; although they were friendly, they did not know each other socially.
5. Richards had a puncture wound to his upper abdomen or lower chest and crosscuts on his neck and wrists. May saw a large kitchen knife on the floor. French told him that he had taken it off the bed and put it on the floor so that it did not injure anyone.
6. May escorted Richards’s ambulance to the Anna Jacques Hospital emergency room. Hospital personnel told May that Richards would be taken to surgery and that it would be early afternoon before he was out.
7. Early that afternoon May went to the I.C.U. where he was joined by LaBarge. The two waited for Richards to come out of surgery.
8. During the operation Richards received general anesthesia in the form of 100 mg. of Fentanyl and 10 mg. of Morphine Sulfate. During questioning by medical personnel and much of the first police statement, Richards remained under the influence of both Morphine and Fentanyl.
9. Richards was wheeled out of surgery and into a treatment room in the I.C.U. as May and LaBarge watched from outside of the room.
10. On the orders of a doctor, Richards’s hands and legs were secured to the bed as a suicide precaution. Police did not request that this be done and had no role in the decision to do so. The medical personnel used leather hospital restraints rather than conventional law enforcement measures such as handcuffs or waist or ankle chains. Police did not impose on him any additional restrictions on his freedom to move.
11. The I.C.U. was organized with patient rooms surrounding a large center island.
12. The police officers could see and hear Richards from where they were waiting. Medical personnel removed a tube from his throat and, as a group of four or five of them gathered around Richards, they asked him basic questions about how he felt, all of which required “yes” or “no” answers.
13. While he occasionally moaned in pain, he answered all questions appropriately.
*703 14. At the time Richards was taking cholesterol medication which did not, in any way, affect his mental functioning.
15. Doherty asked if he knew where he was and Richards said he was in the hospital. Doherty asked if he hurt anywhere and Richards replied that his chest hurt. Doherty then asked, “You stabbed yourself in the chest, do you remember?” He answered, “Yes, I killed my wife.”
16. Most of the medical personnel completed their work and left Richards’ room.
17. As LaBarge and May entered the room, also present were St. Cyr, Doherty, and Richard Markey, the chief nursing officer for the hospital.
18. May was in full police uniform and had a plainly visible gun and badge, while LaBarge was in plainclothes. They stood on the right-hand side of the bed while Doherty and St. Cyr stood on the left side.
19. At about 1:51 P.M., LaBarge twice read Miranda rights to Richards from a state police form (Exhibit # 1):
1. Before we ask you any questions, you must understand your rights.
2. You have the right to remain silent.
3. Anything you say can be used against you in court.
4. You have the right to talk to a lawyer for advice before may ask you any questions and to have him with you during questioning.
5. If you cannot afford a lawyer, one will be appointed for you before questioning if you wish.
6. If you decide to answer questions now without a lawyer present, you will still have the right to stop questioning at any time until you talk to a lawyer.
7. Do you understand what I have read to you?
8. Having these rights in mind do you wish to talk to me now?
20. In reading the Miranda rights, LaBarge spoke quickly as he did when speaking about Miranda rights during the second tape-recorded statement later on that day. For all of the warnings, Richards either nodded, or audibly said, “Yes.”
21. For some of the warnings, LaBarge noted Richards’s responses on the form. For some, all of which were not questions, LaBarge did not note Richards’s acknowledgment.
22. LaBarge marked Exhibit #1 with the date and time.
23. During both police statements, the tone was that of a normal conversation, except that state police spoke faster when speaking about Miranda warnings.
24. Richards continued to feel drugged from the Morphine and Fentanyl and spoke in barely audible, short and a sometimes guttural tone. His mental functioning was impaired by the Morphine and Fen-tanyl as well as by the major surgeiy he had just undergone and by the injuries from his attempted suicide but his answers to the questions were rational and appropriate, indicating his full understanding of the questions.
25. To the extent that Doherty and St. Cyr testified or suggested that, during the entire first police statement, the anesthesia had completely worn off such that it did not impair Richards’s mental functioning, the court finds them not credible and concludes that Richards’s mental functioning was adversely affected by the drugs, but he was able to understand what the police told him and knowingly and intelligently waive his Miranda rights.
26. Richards did not ask for a lawyer and spoke words indicating that he agreed to waive his Miranda rights.
27. LaBarge asked Richards if he would agree to the tape recording of the conversation, and Richards agreed. LaBarge turned on the tape recorder.
28. LaBarge’s primaiy goal was to obtain a statement within the requirements of the law.
29. At the beginning of the interview, after LaBarge summarized the Miranda warnings he asked leading questions, to which Richards gave answers that were difficult to understand he spoke at such a low volume. For about the first three minutes, LaBarge repeated Richards’s answers so that they could be understood on the tape.
30. Richards called himself a “murderer,” and LaB-arge repeated his statement.
31. During the entire first police statement Richards was highly emotional, sometimes sobbing, and in pain from his chest wound and surgeiy.
32. Richards’s answers to police questions were appropriate. May asked Richards a few questions, and when he did so, he spoke at a normal speed.
33. At the end of the first police statement LaBarge told Richards he was going to be charged with First Degree Murder.
34. Police did not promise or suggest that Richards would help himself by giving the statement.
35. The tape-recorded statement took place from about 1:55 to 2:06 P.M., about eleven minutes.
36. Police did not at any time direct or impede Richards’s medical care; medical personnel were present at all times and provided all reasonable care.
37. After the first police statement, police obtained an arrest warrant for Murder from the Newbuiyport District Court and interviewed Richards’s daughter.
38. After 4:00 P.M., LaBarge and May returned to the I.C.U. to ask Richards more questions.
39. Sometime during the first statement, Richards regained his full mental functioning and the effects of the anesthesia had completely worn off. While he was *704 in physical pain, he continued to be able to knowingly and voluntarily understand and waive his Miranda rights and he understood the gravity of his situation.
40. During this statement, police turned the tape recorder on from the beginning.
41. Speaking quickly, police read warnings #2 through #6, #8 and multiple versions of #7 from Exhibit #1 (see finding of fact #19). Richards fully understood the warnings.
42. With physical difficulty, including, as he said, “my eyes are all over the place,” Richards read back the Miranda warnings to police and signed the form at about 4:17 P.M.
43. Richards was still experiencing pain, although greatly reduced, from his chest wound and surgery; he was physically impaired but not mentally impaired.
44. Police did not promise or suggest in any way that giving a statement would help him.
45. At the beginning of this second police statement, police told Richards that he was under arrest and that a judge and lawyer for him would be there soon.
46. Richards admitted to killing his wife and made numerous admissions containing many details indicating that he was mentally unimpaired.
47. The second police statement was about sixteen minutes long.
48. Police did not intentionally violate Richards’s right to use a telephone in the sense that they did not intend to prevent him from using a telephone.
DISCUSSION
I. Voluntariness of Statements
a. Statements Made to Medical Personnel
Richards moves to suppress the statement he made to medical personnel that May and LaBarge overheard as they waited outside of Richards’s hospital room. When Richards began making the statement he was still under the influence of pain medication because he had just been released from surgery. The officers observed four or five medical personnel gathered around Richards who asked him questions about how he felt. At one point Doherty said to Richards, “You stabbed yourself in the chest, do you remember?” Richards responded, “Yes, I killed my wife.”
A confession or an admission whether made to the police or a civilian is admissible only if made voluntarily. Com. v. Sheriff, 425 Mass. 186, 193 (1997). A statement is voluntary if it is the result of a free and willful act. See Com. v. Souza, 428 Mass. 478, 483-84 (1998). Statements made to third persons not acting as agents of the government which police overhear are not protected by the declarant’s privilege against self-incrimination. Com. v. Allen, 395 Mass. 448, 453-54 (1985). The officers’ presence was neither “an unconstitutional intrusion nor an unlawful invasion of [the defendant’s] privacy . . . requiring suppression of [the defendant’s] statements.” See Com. v. Trigones, 397 Mass. 633, 643, aff'd, 296 F.3d 1 (1st Cir. 1986). Nor do the defendant’s statements to medical personnel fall under the protections afforded by the Fifth and Sixth Amendments to the United States Constitution. See id. (“ [Statements made [while in custody at a hospital] to third persons not acting as agents of the government which police overhear are protected neither by the declarant’s privilege against self-incrimination . .. nor by his constitutional right to counsel”).
Although a person’s physical or emotional condition bears on the voluntariness of a statement, Com. v. LeBlanc, 433 Mass. 549, 555 (2001), Richards’s contention that he was in a diminished capacity due to the trauma he experienced, and the surgery he had undergone does not require a finding that his statement to medical personnel was involuntary. Voluntar-iness is a term of art. To have his or her statement suppressed, a defendant must demonstrate that his will was overpowered or compromised in a way that renders the statement involuntary. See Com. v. Magee, 423 Mass. 381, 387-88 (1996) (police officers’ coercive conduct warranted the suppression of the defendant’s statements on voluntariness grounds); but see Com. v. Stryony, 435 Mass. 635, 646-47 (2002) (defendant’s statements to nurses voluntary despite crying and moaning when treated at hospital for slashed writs); LeBlanc, 433 Mass. at 555 ("The fact that a defendant may have been in a disturbed emotional state, or even suicidal, does not automatically make statements involuntary”); Com. v. Clark, 432 Mass. 1, 12 (2000) (defendant’s statement to the police voluntary despite gunshot wound to his head and arm); Com. v. Perrot, 407 Mass. 539, 542-42 (1990) (statements voluntary even though defendant asked for gun to kill himself); Com. v. Allen, 395 Mass. 448, 453-54 (1985) (defendant’s incriminating statements to nurse following brain surgery, not prompted by law enforcement, or coerced were voluntary). Here, the officers were lawfully present in the I.C.U. when they overheard the statement. There was no police misconduct and the “interrogations” were calm, conversational and very short. There was no police misconduct.
b. Statements Made to the Police
Richards also moves to suppress both statements he made to the police on the grounds that he was incapable of making a voluntary statement due to his physical and emotional state. “Voluntariness” is determined by “whether the . . . defendant’s will was overborne to the extent that [his or] her statements were not the result of a free and voluntary act.” Com. v. Sneed, 440 Mass. 216, 222 (2003), citing Com. v. Selby, 420 Mass. 656, 663 (1995). “The Commonwealth bears the burden of proving beyond a reasonable doubt. . . that [the defendant’s] statements were voluntary.” Com. v. Anderson, 445 Mass. 195, 203 (2005), quoting Com. v. Auclair, 444 Mass. 348, 353-54 (2005). The court must consider whether there was *705 physical or psychological coercion, and whether because of a defendant’s medical condition, the statements were not the product of rational intellect and free will. Com. v. Allen, 395 Mass. 448, 455 (1985).
When determining voluntariness of a statement the court looks to “the totality of the circumstances . . .” Com. v. Raymond, 424 Mass. 382, 396 (1997). The following factors are relevant when making an inquiry into the voluntariness of a statement: (1) whether promises or other inducements were made by the police to the defendant; (2) the defendant’s age, education, and intelligence; (3) his experience with the criminal justice system; (4) his physical and mental condition; (5) whether he was under the influence of drugs or alcohol; and (6) the details of the interrogation, including the recitation of Miranda warnings. Com. v. Scott, 430 Mass. 351, 355 (1999).
That Richards was under the influence of pain medication and that his physical and mental condition were poor are relevant factors when evaluating the voluntariness of his statements. However, “[t]he presence of one or more factors suggesting a statement may have been made involuntarily is not always sufficient to render the statements involuntaiy.” Com. v. Selby, 420 Mass. 656, 664 (1995). See Com. v. Look, 379 Mass. 893, cert. denied, 449 U.S. 827 (1980) (upset emotional state did not render statements involuntary); but see Com. v. Meehan, 377 Mass. 552, 563 (1979) (statements held involuntary where defendant was young, poorly educated, intoxicated, was assured confession would aid defense, was told police had strong case against him, and was not informed of his right to make a telephone call).
“Special care must be taken in assessing . . . the voluntariness of the statements when there is evidence that the defendant was under the influence of alcohol or drugs. An otherwise voluntary act is not necessarily rendered involuntary simply because an individual had been drinking or using drugs.” Com. v. Shipps, 399 Mass. 820, 826 (1987). Poor physical condition alone does not require suppression of a statement. See Com. v. Willis, 398 Mass. 768, 776 (1986) (defendant’s statements were voluntary despite stab wounds to his abdomen and arm when his condition was described as “stable, calm, and alert,” and where there was “no suggestion in the record that the defendant suffered from any deficiency or physical condition that would undermine a finding of voluntariness”); Com. v. Kenney, 431 Mass. 141, 146-47 (2002) (denial of motion to suppress affirmed where there was evidence that the defendant spoke clearly and intelligently during the interview and described his actions in detail although the defendant claimed that when questioned by the police he had recently undergone cancer surgery, had been up all night drinking and smoking crack cocaine, had consumed marijuana, was sleep deprived, and had recently vomited in reaction to pain medication).
Police are permitted to rely on a suspect’s outward behavior to determine whether to proceed with an interrogation. Com. v. Lanoue, 392 Mass. 583, 589 (1984). LaBarge read Miranda warnings to Richards twice, and made notations on the Miranda form before beginning the first of the two statements. Richards indicated that he understood his Miranda rights. Although Richards’s voice was, at times, difficult to hear and he mumbled, at times, his statements and responses made sense, and Richards relayed accurate details about his life. The court finds significant that not one response was illogical, nonsensical or otherwise did not make sense. Richards knew where he was, was coherent, understood the questions he was asked, and his memory was intact.
II. Sufficiency of Miranda Warnings
Richards contends that because LaBarge did not record the administration of Miranda rights to him before taking the first statement (which was recorded), the Miranda rights were faulty. The administration of Miranda rights is only implicated when a suspect is subject to custodial interrogation. See Com. v. Jung, 420 Mass. 675, 688 (1995), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966). The “safeguards prescribed by Miranda become applicable as soon as a suspect’s freedom of action is curtailed to a ‘degree associated with formal arrest.’ ” Com. v. Morse, 427 Mass. 117, 123 (1998), quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984). The term “custodial interrogation”[1] means “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Id.
While tape recording the administration of Miranda rights to a defendant is desirable, “there is no rule requiring that the warnings and statements thereafter be recorded electronically.” Com. v. Fryar, 414 Mass. 732, 742 n.8 (1993). The failure to tape record LaBarge reading Richards his Miranda rights does not invalidate the statement. LaBarge read Richards his Miranda warnings prior to beginning the first conversation. This is all that was required.
III. The Validity of Richards’s Waiver of Miranda Rights
Richards also challenges the validity of the waiver he gave to police prior to the first police statement. A waiver of Miranda rights is valid if it is made voluntarily, knowingly, and intelligently when considering the totality of the circumstances. Com. v. Edwards, 420 Mass. 666, 670 (1995). Even if complete warnings have been given to a defendant, the Commonwealth has the burden of proving beyond a reasonable doubt that the waiver was voluntary, knowing, and intelligent. Com. v. Gaboriault, 439 Mass. 84, 89 (2003), citing Magee, 423 Mass. at 386.
Factors such as a defendant’s emotional stability, physical and mental condition are relevant factors *706 when considering the validity of the defendant’s waiver of Miranda rights. See Com. v. St. Peter, 48 Mass.App.Ct. 517, 517-20 (2000); Com. v. Edwards, 420 Mass. 666, 670 (1995).
Although a defendant’s physical and emotional condition bears on the validity of his or her waiver of Miranda rights, St. Peter, 48 Mass.App.Ct. at 517-20, a defendant’s emotional or physical distress when making the waiver does not presumptively invalidate it. See Com. v. Freeman, 430 Mass. 111, 113-15 (valid waiver although defendant was disheveled and hungry after spending four days in the woods prior to arrest); LeBlanc, 433 Mass. at 555 (valid waiver where defendant was distraught, asked for emotional help (after waiving Miranda rights), and swallowed a bullet in a suicide attempt). Although Richards had recently been released from surgery, and was being treated with pain medication, the evidence does not indicate that his waiver of Miranda rights was invalid. LaBarge read Richards his Miranda rights twice before proceeding with the first statement and Richards indicated that he understood the rights as they were administered to him.
a. Dissipated Taint
Although the statements were voluntary and the Miranda waiver was valid, even if these rulings are erroneous, the dissipated taint or attenuation doctrine would support denial of Richards’s motion to suppress. “In determining whether the connection between the evidence and the improper conduct has become so attenuated as to dissipate the taint, the facts of each case must be examined in light of three factors: (1) the temporal proximity of the arrest to the obtaining of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct.” Fradette, 396 Mass. at 460, citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975); see also Com. v. Johnson, 58 Mass.App.Ct. 12, 14 (2003). “Often the most important factor considered relevant is the purpose and flagrancy of the official misconduct.” Id. at 15.
Even in cases when the time is short and there are no intervening factors, confessions cannot be found to be fruit of the poisonous tree if there is no flagrant police misconduct. Com. v. Manning, 44 Mass.App.Ct. 695, 699 (1998).
In Manning the court denied the defendant’s motion to suppress a photograph taken on the date of his illegal arrest even though the photo, which was used to identify the defendant in relation to a separate crime, was taken shortly after the arrest, and there were no intervening factors to consider. Id. at 698-99. The court found that the absence of misconduct by the police warranted a finding that suppression was inappropriate. Id. at 699.
The circumstances here are similar to those in Manning. May responded to the 911 call placed from Richards’s home on June 23, 2006. May observed the location where Richards and his deceased wife were found. May attended to Richards’s wounds. At the hospital LaBarge read Richards his Miranda rights prior to taking both the first and second statements. There is no evidence to support a contention that there was any “flagrant” police misconduct. At best, the defendant has an argument that Richards’s recent surgery and associated anesthesia rendered his statement involuntary; circumstances that are not the responsibility of police. See O’Connor, 406 Mass. at 117 (flagrant misconduct where evidence was seized in violation of a search warrant requirement and would not have been admitted even if its subsequent lawful discovery had been inevitable). Even if there was police misconduct, the taint created by it would have stemmed from the first statement and would have dissipated because the second interview occurred three hours after the first statement; the effects of the anesthesia were gone. See Com. v. Sylvia, 380 Mass. 180, 184-85(1980) (sufficient temporal attenuation to dissipate taint when defendant confessed one and a half hours after his illegal arrest).
b. “Cat out of the Bag”
“The ‘cat-out-of-the-bag’ line of analysis requires the exclusion of a statement if, in giving the statement, the defendant was motivated by the belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements.” Com. v. Mahnke, 368 Mass. 662, 686 (1975). Richards’s statements, including his initial statements to medical personnel, were made voluntarily and were not the result of coercion. For this reason, Richards’s contention that the second statement should be suppressed because “the cat was already out of the bag” is misplaced. See Com. v. Haas, 373 Mass. 545, 554 (1977) (the cat-out-of-the-bag theoiy was employed and defendant’s statements were suppressed where defendant had not been Mirandized and made subsequent incriminatoiy statements while under custodial interrogation).
IV. Telephone Rights
Richards also argues that his statements to the police should be suppressed because he was not advised of his right to make a telephone call while the police questioned him. This ground for suppression is not properly raised as to the first statement because Richards was not under arrest when he made the statement. Under G.L. 276, §33A, only “arrested person[s]” are to be given notice of their right to use the telephone. It is undisputed that Richards was not under arrest when he made any inculpatory statements to the police.
Whether Richards was in custody for purposes of Miranda is irrelevant to Richards’s argument because the Supreme Judicial Court has clearly stated that the provisions of G.L.c. 276, §33A do not attach until a suspect is “formally arrested.” See Com. v. Novo, 442 *707 Mass. 262, 272 (2004); see also Com. v. Caputo, 439 Mass. 153, 162 n.11 (2003) (“Police are not required to inform the defendant that he is entitled to a telephone call until the defendant is arrested”); Com. v. Pileeki, 62 Mass.App.Ct. 505, 510-11 (2004). Even if this is incorrect, and Richards was under arrest for purposes of the telephone rights statute at the beginning of the second statement, the court does not deem this an intentional violation given the timing, just moments before the beginning of the statement, the location, the I.C.U., and the statute’s use of the term “place of detention.” Com. v. Alicea, 428 Mass. 711, 716 (1999), Com. v. Painten, 429 Mass. 536, 542 (1999). There was no violation of G.L.c. 276, §33A.
ORDER
Defendant Kenneth Scott Richards’s motion to suppress statements is denied.

The Commonwealth concedes that at the hospital Richards was in custody for purposes of Miranda and Richards agrees. Both parties assume that Richards being restrained at his doctor’s request was a factor in making the determination that he was in custody. The court is wary of this assumption since detention for medical purposes in the presence of law enforcement does not always mean that a person is in custody for purposes of Miranda. See Com. v. LeFluer, 58 Mass.App.Ct. 546, 550-51 (2003) (defendant’s physical restraint by the EMTs did not create an inherently coercive, police-dominated situation and the protections of Miranda were not triggered).