NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11813


COMMONWEALTH  vs.  CHARLES MONROE.



Worcester.     March 5, 2015. - August 19, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
                 & Hines, JJ.



Constitutional Law, Admissions and confessions, Voluntariness of
      statement, Harmless error.  Practice, Criminal, Admissions
      and confessions, Voluntariness of statement, Motion to
      suppress, Harmless error.  Evidence, Admissions and
      confessions, Voluntariness of statement.  Error, Harmless.




      Indictments found and returned in the Superior Court
Department on November 2, 2010.

      A pretrial motion to suppress evidence was heard by James
R. Lemire, J., and the cases were tried before David
Ricciardone, J.

      The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


      Nancy A. Dolberg, Committee for Public Counsel Services,
for the defendant.
      Donna-Marie Haran, Assistant District Attorney, for the
Commonwealth.

HINES, J.  After a jury trial in the Superior Court, the defendant, Charles Monroe, was convicted of four counts of assault and battery by means of a dangerous weapon (knife); two counts of armed robbery; two counts of indecent assault and battery on a person fourteen years of age or older; two counts of armed kidnapping with serious bodily injury; and one count each of kidnapping and assault and battery.[1]  The convictions were based on three incidents that occurred in October, 2010, during which the defendant, then eighteen years old, accosted three different teenage victims as they walked to school.  The defendant appealed, arguing that (1) admission of statements he made to police during a videotaped interview violated his right to due process, and (2) the trial judge erred in discharging two deliberating jurors.  We transferred the case to this court on our own motion and now conclude that the motion judge erred in denying the defendant's motion to suppress statements and that the statements were admitted at trial erroneously.  On the record before us, we agree that the police engaged in impermissibly coercive tactics that rendered the defendant's statements involuntary under the circumstances of the

---

[1] The defendant was acquitted of three counts of aggravated rape and one count of assault and battery by means of a dangerous weapon (knife).  A nolle prosequi was entered prior to trial on the charges of armed robbery and breaking and entering with intent to commit a felony.

interrogation. Because the erroneous admission of those statements at trial was not harmless beyond a reasonable doubt, we reverse the convictions on that ground[2] and remand for a new trial.

1. Background. We summarize the facts the jury could have found, reserving for later discussion the details of the postarrest interview.

The morning of October 19, 2010, the first victim, E.C., a seventeen year old female, was walking to her bus stop when she noticed a man, later identified as the defendant, walking behind her. The defendant attempted to get her attention, but she did not turn around. The victim crossed the street, evading the defendant. The following morning, E.C. encountered the defendant again on her walk to the bus stop. This time, the defendant got close to her and began asking questions. The defendant attempted to "hug" the victim, but she pushed him away. When the defendant attempted to put his arm around the victim again, she noticed that he was holding a short silver knife, which he placed against her neck, telling her, "Don't scream. Come with me." The defendant led the victim to a tree on the other side of the street. As the victim struggled to get

---

[2] Given our view of the defendant's argument that his statements were admitted at trial erroneously, we do not address his alternative claim that the judge improperly dismissed two deliberating jurors.

away, her backpack fell off her arm; the defendant grabbed the bag and ran away.

On October 25, 2010, the second victim, L.B., a fifteen year old female, was walking to school when the defendant approached her and began walking beside her. L.B. tried to ignore the defendant, but he grabbed her by the neck and pressed down on her throat. He put a knife to her throat, lifted her off the ground, and attempted to move her to a nearby driveway. The victim was able to get her feet back on the ground, remove the defendant's hand from her neck, and move away from the defendant. The victim then ran from the scene. On arriving home, she realized she had minor cuts to her neck and a deep cut on her thumb.

On October 27, 2010, the third victim, A.G., a sixteen year old female, was walking to school when the defendant approached her and told her she looked familiar. A.G. engaged the defendant in conversation, and he said that he would walk her to school. The victim, who was not that familiar with the area, eventually realized that the two were not walking in the direction of her school, and when she stated this, the defendant became angry and aggressive. He told her to walk towards "the green building," and at some point she noticed he had something in his hand. The victim followed the defendant into the building, where he put a knife to her neck.

Inside the building, the victim performed oral sex on the defendant; he also touched her breasts and inserted his penis into her rectum.[3]  After about fifteen minutes, the defendant told the victim to give him another "blow job."  The victim complied, and the defendant eventually ejaculated into her mouth.  The defendant made the victim empty her tote bag in front of him and took a yellow highlighter that had been in her bag.  The defendant then allowed the victim to leave, and she resumed walking towards school.  After disclosing the attack to school officials, the victim was brought to the hospital where a sexual assault exam was performed.  The defendant's deoxyribonucleic acid (DNA) was found on A.G.'s genitals and face.  A.G. identified the defendant as her attacker in a photographic array.  Police recovered a yellow highlighter from the defendant's pocket later that day.

2.  Discussion.  The defendant filed a motion to suppress the statements he made to police officers during a postarrest interview, claiming that even if the waiver of his Miranda rights is deemed valid, his statements were nonetheless involuntary.  The judge denied the motion based on his review of the videotaped interview, the transcript of the interview, and

---

[3] The victim testified that the defendant forced her to perform these acts at knifepoint.  The defendant maintained that the sexual contact was consensual.  The defendant was acquitted of the rape charges stemming from this incident.

the police report prepared after the interview.  The defendant's inculpatory statements and some of his exculpatory statements, made during the interview, were admitted through the testimony of the two interviewing detectives and a redacted version of the videotaped interview that was played for the jury.[4]

On appeal, the defendant argues that the motion judge erred in denying his motion to suppress, claiming that psychological coercion, together with other factors,[5] rendered his statement involuntary and that the admission of his involuntary statement at trial violated his right to due process under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  More specifically, he

---

[4] Although the defendant objected to the portions of the videotape that showed denials made by the defendant, he did not object to playing a redacted version of the videotape showing the defendant's inculpatory statements.  The Commonwealth agreed to certain redactions, but the videotape contained other denials that were admitted as relevant to credibility or to show consciousness of guilt.  Defense counsel renewed his objection to having those portions admitted.

[5] The Commonwealth points out that the defendant's motion to suppress did not reference specifically his youth, emotional instability, lack of food and shelter, lack of access to his family, and lack of notice of the charges as factors probative of the involuntariness of the statements and, citing Commonwealth v. Pina, 406 Mass. 540, 542, cert. denied, 498 U.S. 832 (1990), urges no consideration of these belatedly asserted factors in our review.  We decline to view the issue so narrowly as the additional factors are properly considered within the totality of the circumstances test applicable to the defendant's claim, made in his motion to suppress and on appeal, that his statements were involuntary.

contends that the coercive nature of the detectives' statements regarding the fate of his infant child compels a finding that his statement was involuntary.

a. Standard of review. In reviewing the grant or denial of a motion to suppress, we "review de novo any findings of the motion judge that were based entirely on the documentary evidence." Commonwealth v. Thomas, 469 Mass. 531, 539 (2014). Because the defendant's interview was video recorded, "we are in the same position as the motion judge to determine what occurred during the interview." Id. at 535 n.4.

b. The interview. The following summary is based on our review of the unredacted videotape of the defendant's postarrest interview and the police report prepared on that same date.[6] The defendant was arrested at approximately 4 P.M. on Wednesday, October 27, 2010, in connection with the crimes against the three victims. Following his arrest, he was transported to the Worcester police detective bureau. By 4:15 P.M., the defendant was seated alone in an interview room with his hands cuffed behind his back.

---

[6] The unredacted videotape was marked as an exhibit at trial and is the only version of the videotape in the record. We have not been provided with the list of statements redacted from the videotape. Because it is clear from the record that the defendant's inculpatory statements, made after the defendant's will was overborne, were contained on the redacted version of the videotape that was played for the jury, we are able to resolve this appeal without reviewing these materials.

At approximately 4:30 P.M., Detectives James O'Rourke and Donna Brissette entered the room. Detective O'Rourke asked the defendant to stand and moved the defendant's cuffed hands from behind his back to in front of him. Detective O'Rourke advised the defendant that the interview was being videotaped, informed him of his right to use a telephone, read him his Miranda rights, and informed him that he was at the detective bureau concerning a warrant. When the defendant asked about the substance of the warrant, Detective O'Rourke informed the defendant that he could not tell the defendant about the substance of the warrant unless the defendant waived his Miranda rights and agreed to speak with the officers. The defendant then signed a waiver of his Miranda rights.

Detective O'Rourke then asked the defendant several background questions, on topics including his education and whether he had any children. The defendant said that he was working toward his general education degree (GED) and that he has both a son and a daughter. At 4:43 P.M., the detectives informed the defendant for the first time that he had been positively identified by three victims of assaults that occurred on October 20, October 25, and earlier that morning, October 27. In connection with the assaults, Detective O'Rourke asked the defendant questions regarding his whereabouts and activities earlier that morning and on October 25. The detective went on

to tell the defendant that he "should be trying to help [himself] out," and after that point the interview grew increasingly aggressive.  Detective O'Rourke informed the defendant that he would only have "one opportunity to talk . . . and tell [the detectives] why this happened."

At this point in the interrogation, Detective Brissette turned the conversation toward the defendant's daughter, asking him her age and about the family's involvement with the Department of Children and Families (DCF).[7]  The defendant responded by stating, "Don't tell me they're going to take my daughter 'cause -- don't even tell me 'cause I don't want to hear it.  'Cause my daughter is the most important thing in my life."  The detective continued on the subject of the defendant's child, suggesting that the defendant was aware of a scheme by the child's mother to get "money from [w]elfare and stuff," but that the defendant was "playing dumb" during the DCF investigation just as he was doing with the questions about his whereabouts when the victims were attacked.

During the next few minutes of the interrogation, the defendant told the police that he had emigrated from Africa with

---

[7] The detective referred to the agency by its former name, the Department of Social Services.  The detectives specifically asked about a case opened about one month before the defendant's arrest where the defendant's girl friend reported that their daughter had fallen.

his family, that he had emotional problems, that he had not eaten or showered recently, and that he had slept on the stairs inside the house where he once had lived with his family.  He also revealed that he was aware the police were looking for him but that he did not know why, only to be interrupted by the detective stating, "You damn well know why the cops were looking for you."  It was at this point that the interrogation turned from questions about the defendant's background back to the subject of his child.  At 4:45 P.M., the detective stated the following:

> "[T]his is the time to talk to us about what happened, okay?  You know what happened.  This is your opportunity. You're probably going to end up going away for a long time. You're not going to see that two month old baby for a long, long time, okay?  This is the time, maybe this morning you met this girl, maybe it was consensual or whatever but this is the time to talk to us about it and what was going on the last couple of -- last week, with those two other girls.  This is the time to talk to us about it and tell us about it, okay?  Look at me, don't keep looking away from us."

The defendant then dropped his head into his hands and began to cry, eliciting from the detective a command to stop "looking away."  The defendant explained that "the only reason why I'm crying 'cause I don't want to live a day without seeing my daughter."

This exchange preceded a barrage of references to the defendant's child and girl friend, with the detectives repeatedly telling the defendant to "think of [his] daughter,"

"think of [his] girl friend," that he would be the reason his girl friend lost custody of their child, and that he would be the reason his child would be raised by strangers.  At 4:56 P.M., the detectives, alternating between each of them without any responses from the defendant, stated, "[Y]ou're going to be the reason your girl loses that baby"; "'Cause you know what, there's a 51A[8] just like there was the last time, [DCF] is already involved with you and with your daughter"; and "At least have that baby grow up with someone they know.  The baby might not see you but at least it will be with the mom."  Additionally, the detectives provided potential reasons as to why the defendant may have committed the assaults and robberies during this period, stating for example that "things are a little tough right now.  You got a three month old that means the world to you and don't know how you're even going to provide for her."  The defendant continued to cry, held his head in his hands, was generally unresponsive to the detectives' questions, and stared blankly in front of him.[9]

---

[8] A report of suspected child abuse filed with the Department of Children and Families in accordance with G. L. c. 119, § 51A, is frequently referred to as a 51A report.

[9] The defendant did, however, answer a few questions and made limited exculpatory statements during this period, stating "I didn't attack no girl this morning"; "I'm not raping, I didn't sleep with none of them"; and "I didn't have sex with none of them."

Within minutes of these repeated references to the possibility that the defendant's girl friend could lose custody of the child, the defendant made incriminating statements regarding the three incidents.  He first acknowledged that there was one dollar in E.C.'s backpack the prior week.  The defendant then conceded that he had walked with A.G. earlier that morning but maintained that they did not have any sexual contact and that he did not assault her.  Detective Brissette later told the defendant that they had evidence of the defendant's DNA on A.G. from the assault that morning.  After more prodding by the detectives, the defendant remarked, "I'm going to tell on behalf of my daughter, because I love my daughter . . . I'm going to talk -- I'm going to tell you the truth because I love my daughter."  The defendant then admitted that A.G. performed oral sex on him and that he ejaculated on her exposed buttocks, but stated that she initiated this contact.  He also admitted that he robbed E.C. and L.B. and that he had a knife when he robbed L.B., but that he only pulled out the knife once she tried to fight him.

The detectives asked whether he had committed any other robberies, and the defendant responded that maybe he committed

robberies "a long time ago."[10]  The defendant further stated, "I get emotional problems, 'cause I do have emotional problems.  I need help, that's all I need."

     c.  Voluntariness.  A voluntary statement is one that is "the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion." Commonwealth v. Tremblay, 460 Mass. 199, 207 (2011), quoting Commonwealth v. LeBlanc, 433 Mass. 549, 554 (2001).  In applying this principle, "we examine whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." Commonwealth v. Selby, 420 Mass. 656, 663 (1995), S.C., 426 Mass 168 (1997).  "[B]oth the characteristics of the accused and the details of the interrogation" are encompassed in the analysis of the totality of circumstances (citation omitted).  Commonwealth v. Tavares, 385 Mass. 140, 146, cert. denied, 457 U.S. 1137 (1982), quoting Commonwealth v. Daniels, 366 Mass. 601, 606 (1975).  More specifically, we may consider "promises or other inducements, conduct of the defendant, the defendant's age,

---

[10] The record reflects that the Commonwealth and the defendant agreed to redact the portion of the videotaped interview relating to prior robberies that were not the subject of this trial, but that this information was not redacted from the version shown to the jury because of a technical error.

education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, . . . and the details of the interrogation, including the recitation of the Miranda warnings."  Commonwealth v. Mandile, 397 Mass. 410, 413 (1986), S.C., 403 Mass. 93 (1988), and cases cited.  The Commonwealth bears the burden to establish beyond a reasonable doubt that the defendant's confession was voluntary in accordance with these principles.  Commonwealth v. Baye, 462 Mass. 246, 256 (2012).  After considering all of the factors essential to our review of the totality of the circumstances surrounding the interrogation, especially the use of psychologically coercive tactics related to the defendant's child, we conclude that the Commonwealth has failed to meet that burden.

     i.  Coercion relating to the defendant's child.  The police interrogation of the defendant, rife with threats to the defendant's ability to maintain contact with his infant daughter, properly may be characterized as psychologically coercive.  See Commonwealth v. DiGiambattista, 442 Mass. 423, 435-436 (2004) ("Coercion may be readily applied by way of implied threats and promises, just as it is by express threats and promises").  Here, as evidenced by the videotaped interview, the detectives threatened the defendant with the loss of contact with his child by repeatedly and falsely claiming that if he did

not tell them what happened, the child could be taken away and raised by strangers. Although we have stated that a particular tactic generally will not render a confession involuntary, see Selby, 420 Mass. at 664, the particular conduct at issue here, threats concerning a person's loved one, may impinge on the voluntariness of a defendant's confession. Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (defendant's statement involuntary when induced by threats that financial aid to infant children would be discontinued and children taken from her if she failed to confess). See Commonwealth v. Scott, 430 Mass. 351, 355 (1999), citing Commonwealth v. Berg, 37 Mass. App. Ct. 200, 206 (1994) ("Concern for a loved one may, in certain circumstances, render a confession involuntary"). See also Commonwealth v. Hunt, 12 Mass. App. Ct. 841, 844-845 (1981) ("concern for one's family may be as significant in inducing an involuntary confession as a concern for oneself"). The issue boils down to whether the Commonwealth has met its burden to prove beyond a reasonable doubt that the police tactics were not "so manipulative . . . that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." Baye, 462 Mass. at 256, quoting United States v. Walton, 10 F.3d 1024, 1030 (3d Cir. 1993).

The temporal relationship between the defendant's inculpatory statements and the detectives' psychologically

coercive tactics is clear and close and it supports our conclusion that the defendant's will was overborne and that his statements were involuntary. Contrast Commonwealth v. Durand, 457 Mass. 574, 596-597 (2010). The chronology is telling. The defendant made his first incriminatory statement at 5:05 P.M.[11] after the litany of threats described above, and more specifically three minutes after the detectives repeated their suggestion that the defendant's child would be protected from an adverse custody determination if he confessed. Before he implicated himself in response to the threats regarding his child, the defendant was not told that the police lacked the power to remove the child from his girl friend's custody or that his confession would have no bearing on whether the child's custody status could be changed.[12] The convergence of the defendant's apparent devotion to his child as reflected in his statements and conduct during the videotaped interview, the defendant's ignorance of the authority of the police to effect a change in his child's custody, and the prominence of the psychologically coercive tactics during the interrogation

---

[11] The defendant acknowledged that there was one dollar in E.C.'s backpack, indicating for the first time that he was with E.C. and knowledgeable of the contents of her backpack.

[12] See generally G. L. c. 119, § 24 (procedures for removal of child from parents' custody).

persuades us that the defendant lost the ability to "make an unconstrained, autonomous decision to confess," Baye, 462 Mass. at 256, quoting Walton, 10 F.3d at 1030, and thus, his will was overborne.  That breaking point occurred at approximately 4:57 P.M., when the defendant reacted to Detective O'Rourke's statement, "At least have that baby grow up with someone they know" by stating, "Please don't take my daughter"; hanging his head; and crying.[13]  His inculpatory statements followed.

The defendant's personal characteristics, considered as part of the totality of the circumstances of the videotaped interview, also are relevant to our conclusion that his will was overborne by the police tactics involving his child.  During the interrogation, the defendant alerted the police to and demonstrated a disturbed emotional or physical state, a factor relevant to voluntariness.  LeBlanc, 433 Mass. at 555; Commonwealth v. Magee, 423 Mass. 381, 388 (1996).  In Magee, supra at 383, the defendant was "exhausted, emotionally distraught, and disheveled, and her responses to questions were

---

[13] Although the defendant made limited exculpatory statements during the period between 4:54 and 4:57 P.M., he was generally nonresponsive until he made his first incriminating statement.  The exculpatory statements made by the defendant do not render his statements voluntary where the defendant's will was overborne by the detectives' repeated threat to have his child removed from her mother's care unless the defendant confessed to the charges.  Cf. Commonwealth v. Vazquez, 387 Mass. 96, 100 (1982) (exculpatory statements tend to show defendant capable of rational thought).

interrupted by periods of sobbing and shaking." In that case, we held that the defendant's debilitated physical and emotional state, together with psychological coercion in the form of a promise by police that she would receive the medical treatment she requested in return for her statement to police, rendered her statement involuntary. Id. at 388. Like the defendant in Magee, the defendant in this case was in an emotionally disturbed state at the time of his interview. He informed the police of his condition but nonetheless was subjected to the psychological coercion described above. Here, the defendant was generally unresponsive to police questioning until the police made threats regarding the custody of his child. After that occurred, the defendant cried and invoked his love for his child before providing inculpatory statements to the police. As in Magee, although the defendant's emotional and physical condition is not determinative, his condition is a substantial factor in our consideration of whether his will was overborne by the police tactics. Id. at 388.

We consider as well the defendant's age and educational background in our analysis of the voluntariness of the defendant's statements. See Commonwealth v. Meehan, 377 Mass. 552, 567 (1979) (defendant's youth and poor educational background may support finding of involuntariness). Here, the defendant had recently turned eighteen years of age and was in

the process of obtaining his GED at the time of his arrest.  He had emigrated from Africa to the United States just six years prior.  While these factors alone are insufficient to warrant suppression of the defendant's statements, the defendant's young age and poor educational background support the conclusion that his statements were involuntary.  See id.

Last, the hostile tone of the interview also supports our conclusion that the defendant's will was overborne during the course of the interview.  See Commonwealth v. Johnson, 463 Mass. 95, 103 (2012).  In Johnson, supra, we recognized that the environment of an interview may be considered oppressive if the defendant is handcuffed.  Here, the defendant's handcuffs were not removed.  Moreover, the tone of the interview was hostile where the two detectives volleyed statements between them, often times leaving no opportunity for the defendant to respond.

Taken together, these factors persuasively demonstrate that the defendant's will was overborne and that, as a consequence, statements made thereafter were involuntary.  The use of those statements against the defendant at trial was constitutional error.

ii.  Other tactics.  We comment briefly on the detectives' use of other interrogation techniques which, although not dispositive, contributed to the defendant's loss of his "ability to make an unconstrained, autonomous decision to confess."

Baye, 462 Mass. at 256, quoting Walton, 10 F.3d at 1030. First, "minimization" during interrogation of a crime of which a defendant is accused, combined with other factors, can render a confession involuntary because minimization carries with it an implied promise that the requested confession will result in lenient treatment. DiGiambattista, 442 Mass. at 439. Prior to the defendant making any inculpatory statements, the detectives offered the defendant reasons for why he may have committed the alleged robberies, such as needing money to buy food for himself and his infant daughter, and minimized the rape allegation by pointing out that both the defendant and the alleged victim were old enough to engage in consensual sexual activity.

Second, "[t]he use of false information by police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily." Selby, 420 Mass. at 664. Here, Detective Brissette informed the defendant that they had evidence of his DNA on the victim who had allegedly been assaulted that morning. It is evident from the record that the detectives could not have yet known to whom any DNA recovered from that victim belonged. In combination with the psychological coercion, the minimization and false statement support our conclusion that the defendant's inculpatory statements were involuntary.

d. Effect of the constitutional error. Having concluded that it was constitutional error for the defendant's involuntary statements to be used against him at trial, we must now determine whether to set aside his convictions. See Durand, 457 Mass. at 592, quoting Mincey v. Arizona, 437 U.S. 385, 398 (1978) ("any criminal trial use against a defendant of his involuntary statement is a denial of due process of law" [emphases in original]). The defendant argues that his convictions must be vacated because the admission of his statements was a structural error. We have not yet determined whether the structural error standard should apply or whether, with the defendant having filed a motion to suppress on constitutional grounds, the harmless error standard should apply, and we do not do so here. See Durand, supra (reserving for another day whether structural error applies). See also Commonwealth v. Hoyt, 461 Mass. 143, 154 (2011), quoting Commonwealth v. Whelton, 428 Mass. 24, 25-26 (1998) ("The denial of a motion to suppress evidence on constitutional grounds . . . is reviewable without further objection at trial"). Under the harmless error standard, "we consider 'the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly

admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt.'" Thomas, 469 Mass. at 552a, quoting Commonwealth v. Santos, 463 Mass. 273, 287 (2012). Because we conclude that the introduction of the defendant's involuntary statements was not harmless beyond a reasonable doubt, we need not resolve the question.

The defendant's incriminating statements contained on the videotape were pivotal to the Commonwealth's case. Although the Commonwealth presented the testimony of the three victims and other evidence tying the defendant to the incidents, such as DNA evidence and his clothing, the extent of criminal liability from the incidents depended on credibility. Because the defendant did not testify, the video recording provided the jury with his description of the encounters. During the involuntary portion of the interview, the defendant admitted that he robbed E.C. and L.B., that he pulled out a knife on L.B., and that he had sexual contact with A.G. Therefore, the prosecution was able to use the nontestifying defendant's involuntary statements to support the victims' credibility. The prosecutor also referenced the defendant's videotaped statements in his closing argument,

telling the jury that the defendant admitted to having a knife on him during all three incidents.[14]

Moreover, the defense strategy was limited by the introduction of the involuntary statements. Defense counsel conceded to the acts that the defendant admitted performing during his videotaped interview, specifically robbing the first victim, using a knife while intending to rob the second victim, and having consensual sex with the third victim. Defense counsel argued that the Commonwealth failed to prove the remaining charges.[15]

The error in admitting the defendant's involuntary statements was further compounded by the erroneous introduction of a statement in the videotape that the defendant had previously committed robberies not related to the charged offenses. Thus, the jury heard evidence of bad acts that were not properly admitted. Although the judge provided instructions

---

[14] In the interview, Detective Brissette asked, "where's the knife that you`ve been carrying for a few days?"; the defendant responded, "I lost it," and described a silver and brown pocket knife.

[15] Specifically, defense counsel argued that the Commonwealth failed to prove assault and battery with a dangerous weapon and kidnapping against the first victim; kidnapping of the second victim; and rape, indecent assault and battery, and kidnapping against the third victim. Of these charges, the defendant was convicted of assault and battery with a dangerous weapon and kidnapping against the first victim, kidnapping of the second victim, and indecent assault and battery against the third victim.

on this point, the prejudice caused by introduction of the videotaped statements was further compounded by this error and we conclude that the admission of the videotaped statement was not harmless beyond a reasonable doubt.  Santos, 463 Mass. at 289.

3.  Conclusion.  The judgments are reversed and the verdicts set aside.  The case is remanded to the Superior Court where the defendant is to receive a new trial in accordance with this opinion.

So ordered.